FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

NOV 18 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, | ) |
| Petitioner, | ) ) ) |
| WYOMING WOLF COALITION, | ) ) |
| Petitioner-Intervenor, | ) ) ) |
| v. | ) Case No. 09-CV-118J |
| UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE; KEN SALAZAR, in his official capacity as Secretary of the United States Department of the Interior; ROWAN GOULD, in his official capacity as Acting Director of the United States Fish and Wildlife Service; and STEPHEN GUERTIN, in his official capacity as the Regional Director for the Mountain-Prairie Region of the United States Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Respondents. | ) |

consolidated with

1

| BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF PARK, STATE OF WYOMING, | ) ) ) | |
|---|---|---|
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-138J |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES  FISH AND WILDLIFE SERVICE; KEN SALAZAR, in his official capacity as Secretary of the United States Department of the Interior; ROWAN  GOULD, in his official capacity as Acting Director of the United States Fish and Wildlife Service; and STEPHEN GUERTIN, in his official capacity as the Regional  Director for the Mountain-Prairie Region of the United States Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

## ORDER SETTING ASIDE AGENCY DECISION IN PART
## AND
## REMANDING AGENCY DECISION IN PART

The parties' briefs on the merits have come before the Court for consideration.  The Court, after considering the parties' written submissions, the applicable law, the administrative record, the arguments of counsel at the hearing, and being fully advised, FINDS and ORDERS as follows:38

2

## Background

This action is brought pursuant to Section 706 of the Administrative

Procedure Act, 5 U.S.C. § 706, seeking review of the United States Fish &

Wildlife Service's (sometimes "Service" or "FWS") decision not to approve the

state of Wyoming's proposed wolf management scheme and refusing to delist

the gray wolf in Wyoming.

The issue, as stated by the State of Wyoming and Park County in their

Joint Opening Brief, is:

Did the [Fish and Wildlife] Service act arbitrarily, capriciously, and otherwise not in accordance with law in finding that the State's wolf management scheme does not satisfy the "adequate regulatory mechanisms" requirement for delisting in the Endangered Species Act ("ESA")?

The Intervenor Wyoming Wolf Coalition adopts the above statement of

issues as its own.

The government states the issue somewhat differently:

Whether FWS rationally determined that gray wolves in Wyoming remain endangered due to inadequate laws, regulations, and a management plan governing wolf protection and management in the State of Wyoming.

In this case, the petitioners[1] assert that the FWS has chosen to ignore the

---

[1]Unless otherwise specified, for reasons of convenience, the Court will
(continued...)

3

prior history of this case, has caved into political pressures, ignoring the requirements of the Endangered Species Act and has relied on information other than the best scientific and commercial data available in making its decision not to approve Wyoming's proposed wolf management plan providing for a dual classification (trophy and predator) within certain areas of the state of Wyoming. The petitioners contend that the FWS allowed political and public relations considerations and speculative concerns about post-delisting lawsuits to influence its decision, even though the FWS's own biologists and an independent panel of peer review biologists believed that classifying wolves as predators throughout most of Wyoming would not threaten the viability of the gray wolf population in the Northern Rocky Mountain region, as long as the state classified wolves as trophy game in northwestern Wyoming.

On December 12, 2007, FWS approved a Wyoming wolf management scheme. On February 27, 2008, FWS issued a final rule recognizing the NRM DPS and delisting the NRM wolf population in all of the DPS. 73 Fed. Reg. 10514 (2008 rule).

Wyoming's then-approved wolf management scheme classified wolves as

---

[1](...continued)

refer collectively to the petitioners in both consolidated cases, as well as the intervenor, as "petitioners."

4

trophy game in a designated area in northwestern Wyoming and as predators throughout the remainder of Wyoming. After the delisting decision, the United States District Court for the District of Montana issued a preliminary injunction which relisted the NRM wolf population pending final resolution in that matter. Petitioners state that the Montana district court chastised FWS for not explaining why this dual classification in Wyoming was approved in 2007 when it had been rejected in 2004 and 2006. The petitioners state: "This rebuke from the court left the Service with only one option if it wanted to save the delisting rule -- the Service had to admit that it was wrong to demand the statewide trophy game classification in 2004 and 2006. Rather than admit this, the Service instead rescinded the delisting rule and eventually revoked its previous approval of the State's wolf management scheme." State/Park County Brief, Docket Entry 26 at 2. FWS "now again refuses to delist wolves in Wyoming unless the State adopts a statewide trophy game classification for wolves and has "chosen pride over its legal obligation to follow the unambiguous requirements of the ESA[.]" Id.

In ruling on the preliminary injunction in the Montana case, the Montana district court stated:

> In my view, Plaintiffs are likely to succeed on the majority of

5

the claims relied upon in their request for a preliminary injunction. In particular, (1) the Fish & Wildlife Service acted arbitrarily in delisting the wolf despite a lack of evidence of genetic exchange between subpopulations; and (2) it acted arbitrarily and capriciously when it approved Wyoming's 2007 plan despite the State's failure to commit to managing for 15 breeding pairs and the plan's malleable trophy game area. In both instances, the Fish & Wildlife Service altered its earlier position without providing a reasoned decision for the change based on identified new information.

As recently as 2002, the Service determined genetic exchange between wolves in the Greater Yellowstone, northwestern Montana, and central Idaho core recovery areas was necessary to maintain a viable northern Rocky Mountain wolf population in the face of environmental variability and stochastic events. The Fish & Wildlife Service nevertheless delisted the wolf without any evidence of genetic exchange between the wolves in the Greater Yellowstone core recovery area and the other two core recovery areas. To justify its decision, the Service relied on the same information that was available to it when it determined genetic exchange was necessary in 2002.

In 2004, the Fish & Wildlife Service rejected Wyoming's 2003 wolf management plan. The Service determined the 2003 plan was inadequate to protect wolves because it permitted Wyoming state officials to classify the wolf as a predatory animal throughout the state and then failed to clearly commit the state to managing for 15 breeding pairs within its borders. Before delisting the wolf, the Fish & Wildlife Service approved Wyoming's revised 2007 plan. This revised plan suffers from the same deficiencies as the 2003 plan: it classifies the wolf as a predatory animal in almost 90 percent of the state and only commits the state to managing for 7 breeding pairs outside the national parks. In supporting its decision to approve Wyoming's 2007 plan, the Service does not offer any information not available to it when it rejected the 2003 plan. Armed with the same information, the agency flip-flopped without

6

explanation. While the Fish & Wildlife Service can change its recovery criteria, it must nevertheless provide a reasoned analysis for the change of position and if it does so, its decision is entitled to deference. The Service has failed to do so here. Thus, in my view, Plaintiffs are likely to succeed on several of their claims.

Plaintiff has also shown a significant possibility of irreparable injury. More wolves will be killed under state management than were killed when ESA protections were in place. Idaho, Montana, and Wyoming each have public wolf hunts scheduled for this fall. Additionally, the states' defense of property laws permit the killing of wolves in more circumstances than defense of property regulations under the ESA. The killing of wolves during the pendency of this lawsuit will further reduce opportunities for genetic exchange among subpopulations. Genetic exchange that did not take place between larger subpopulations under ESA protections is not likely to occur with fewer wolves under state management. Absent genetic exchange, the viability of the wolf will be threatened by future environmental variability and stochastic events.

Because plaintiffs have demonstrated a likelihood of success on the merits of several of their claims and the possibility of irreparable injury, their motion for a preliminary injunction is granted. The limited preliminary relief will reinstate ESA protections for the northern Rocky Mountain gray wolf to ensure the species is not imperiled during the pendency of this lawsuit.

Defenders of Wildlife et al v. Hall, United States District Court for the District of

Montana, 08-56-J-DWM, at 1-6, Exhibit D attached to Docket Entry 27.

(Opinion published at 565 F. Supp.2d 1160 (D. Mont. 2008)).

Thereafter, FWS met with Wyoming representatives, notified them of

shortcomings in the Wyoming scheme and requested revisions. Wyoming

7

declined to do so. At FWS request, on October 14, 2008, the 2008 Rule was vacated and remanded to the agency for further consideration. Docket Entry 31 at 7-8; Exhibit B, Docket Entry 27 at 15125.

After this ruling on the preliminary injunction in Montana, Wyoming prepared emergency regulations and a draft revised wolf management plan on October 27, 2008. Attachment C to Document 26 (Emergency Chapter 21 Rule) and Attachment D to Docket Entry 26 (Chapter 21 Rule). The FWS notified the governor on January 15, 2009 that Wyoming no longer had an FWS approved wolf management plan.

The Final Rule removing ESA protections of the gray wolf through the NRM DPS (Northern Rocky Mountain Distinct Population Segment) except for Wyoming is at Fed. Register Vol. 74, No. 62 (dated April 2, 2009), Exhibit B, attached to Docket Entry 27.

The 2009 Final Rule is exhaustive and addresses the perceived deficiencies in the Wyoming plan in many places. The petitioners complain about the requirement that the entire state of Wyoming be designated as a trophy game area, rather than the smaller area (approximately 12% of the state, including the Greater Yellowstone Area) currently shown in Wyoming's plan as trophy game area, with the remainder of the state being designated as

8

a predator area, where there are no kill restrictions on wolves in place. Petitioners also complain about the 2009 Final Rule's discussion and requirements for genetic connectivity. Petitioners argue the 2009 Final Rule is not based on sound science, is not based on the best commercial and scientific data available and does not satisfy the requirements of the ESA and APA. The petitioners assert that the Service acted arbitrarily and capriciously when it determined that the previously-approved wolf management scheme for the state of Wyoming could not be approved. The refusal to delist the wolves, unless the state of Wyoming adopts a statewide trophy game classification is not based on any biological reason, in petitioners' view.

The relief sought by the petitioners includes: (1) setting aside the portion of the final delisting in which the FWS deems the state of Wyoming's wolf management scheme inadequate; (2) remanding that portion of the final delisting rule to the Service with explicit directions to approve the State's wolf management scheme as an "adequate regulatory mechanism" for purposes of the ESA; and (3) ordering the Service to amend the final delisting rule so as to delist wolves throughout all of Wyoming. The Wolf Coalition requests an order remanding back to the FWS with instructions to approve the Wyoming plan and to immediately begin the delisting process.

9

The government disagrees with any assertion that it has acted arbitrarily and capriciously. It opposes the relief requested in its entirety. However, if the Court were to grant the relief requested by petitioners, the government asserts that the appropriate remedy would be to hold unlawful and set aside the agency action at which time the matter would return to the agency for reconsideration. It would not permit the Court to order delisting of wolves or order how wolves are to be managed within Wyoming. To do so would be improper and contrary to law.

## Parties' Contentions

The petitioners agree that administrative decisions concerning the ESA are reviewed under Section 706(2) of the APA, where a reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, contrary to constitutional right, in excess of statutory limitations, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)-(C). They cite Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999), which provides:

> "[I]n determining whether the agency acted in an 'arbitrary and capricious manner,' we must ensure that the agency 'decision was based on a consideration of the relevant factors' and examine

'whether there has been a clear error of judgment.'" Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir.1997) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). We consider an agency decision arbitrary and capricious if

> "the agency ... relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Id. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

The petitioners argue in their opening brief:

> To satisfy the 'arbitrary and capricious" standard, the agency must examine the relevant data and articulate a satisfactory explanation for its decision, including a rational connection between the facts found and the choice made. Citizens' Comm. to Save Our Canyons v. United States Forest Serv., 297 F.3d 1012, 1035 (10th Cir. 2002). When a federal agency adopts a new rule to replace a prior rule, the agency must provide a 'reasoned explanation' for the new rule if the new rule 'rests upon factual findings that contradict those which underlay' the prior rule or when the prior rule 'has engendered serious reliance interests that must be taken into account." Fed. Communications Commission v. Fox Television Stations, Inc., ___ U.S. ___, 129 S.Ct. 1800, 1810 (2009). In this "reasoned explanation," the agency must make clear its reasons "for disregarding facts and circumstances that underlay or were engendered by" the prior rule. Fox Televisions Stations, 129 S.Ct. at 1811.

Document 26 at 22-23.

11

The petitioners assert that the final delisting rule at issue here rests upon numerous factual findings that contradict the facts which supported the first delisting rule. They disagree with FWS's assertion that its prior approval of the State's dual classification scheme was wrong because it "failed to consider the impacts of the predatory animal area to genetic connectivity" as stated at 74 Fed. Reg. at 15170. In adopting the first delisting rule, the Service claimed to have carefully considered "all of the available information" on the genetic connectivity issue and concluded that the lack of genetic connectivity between the states in the NRM DPS was not a threat to the recovered wolf population, 73 Fed. Reg. at 10533, 10540, 10553.

Petitioners contend the first delisting rule "also engendered serious reliance interests that must be taken into account." Petitioners' Joint Brief at 23. Before Wyoming's HB 213 was enacted, the Service indicated it would approve the state's management scheme if it satisfied three requirements which were addressed in HB 213. Additionally, the Wyoming Game & Fish Commission ("WGFC") adopted the second Wyoming plan based upon specific amendments suggested by the Service. For these reasons, petitioners argue the heightened standard of review from Fox Television Stations should apply in

12

this case.

The government asserts that ESA claims are governed by the APA's arbitrary, capricious, abuse of discretion or otherwise not in accordance with law standard. The Court's inquiry must be thorough and the Court's duty is "to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Cliffs Synfuel Corp. v. Norton, 291 F.3d 1250, 1257 (10th Cir. 2002); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989). "It is not [the court's] duty, however, to substitute [its] judgment for that of the agency's on matters within its expertise." Colorado Wild. Heartwood v. U.S. Forest Serv., 435 F.3d 1204, 1213-1214 (10th Cir. 2006). Nor is it a court's role to weigh conflicting evidence or evaluate credibility, Pennaco Energy, Inc. v. United States Department of Interior, 377 F.3d 1147, 1159 (10th Cir. 2004), or otherwise decide the propriety of competing methodologies, Silverton Snowmobile Club v. United States Forest Service, 433 F.3d 772, 782 (10th Cir. 2006). Thus, the government contends the applicable APA standard of review is narrow and highly deferential to the agency. The deference given to an agency is especially strong where, as here, "the challenged decisions involve technical or scientific matters within the agency's area of expertise." Utah Environmental Congress

13

v. Bosworth, 443 F.3d 732, 739 (10th Cir. 2006); Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1213 (10th Cir. 2002).

The government's position is that its decision, as set forth in the 2009 Final Rule, is rational and based upon the best scientific and commercial data available. FWS did not rely on one single factor in finding that Wyoming's current laws, regulations, and management plan were inadequate. To the contrary, numerous factors when considered together led FWS to conclude that Wyoming's proposed regulation of gray wolves is not likely to maintain a recovered wolf population in Wyoming or adequately provide for demographic and genetic connectivity with the Idaho and Montana populations. It contends that the majority of the petitioners' arguments to the contrary are based on prior rulemakings, past agency statements, and FWS's guidance about the future and that those arguments ignore the basis and rationale for the 2009 Final Rule at issue in this case.

The (65 page, 3 column small font) 2009 Final Rule at issue is published in the Federal Register, Vol. 74, No. 62, April 2, 2009, at 15123 et seq. and is attached to Document 27 as Exhibit B. The rule approved delisting in Montana and Idaho, but preserved wolf protections in Wyoming, noting that removal from the ESA was dependent upon the State's wolf law (Wyo. Stat. §§ 11-6-302

14

*et seq.* and 23-1-101 *et seq.* in House Bill 213) and a wolf management plan

. . . adequately conserving Wyoming's portion of a recovered NRM wolf population. In light of the July 18, 2008, U.S. District Court order, we reexamined Wyoming law, its management plans and implementing regulations, and now determine they are not adequate regulatory mechanisms for the purposes of the Act.

We determine that the best scientific and commercial data available demonstrates that (1) the NRM DPS is not threatened or endangered through "all" of its range (i.e., not threatened or endangered throughout all of the DPS); and (2) the Wyoming portion of the range represents a significant portion of range where the species remains in danger of extinction because of inadequate regulatory mechanisms. Thus, this final rule removes the Act's protections through the NRM DPS except for Wyoming. Wolves in Wyoming will continue to be regulated as a nonessential, experimental population per 50 CFR 17.84(i) and (n).

Id., 74 Fed. Reg. at 15123.

The petitioners argue that this position, which is contrary to the earlier decision, is not based upon the best scientific or commercial information and is based upon improper political considerations. They challenge the ability of the agency to change its mind or reevaluate prior delisting decisions and contend that nothing has changed that would permit the decision not to delist to stand under any standard of APA review. They contend the pertinent peer reviews remain the same and that those reviews are the best science and the only thing that the decision to delist should be based upon. The petitioners' position is that the State's wolf management plan need only be "adequate" and that it is

15

"adequate" when it permits the State to manage for at least 15 breeding pairs and 150 wolves.

The government argues the petitioners have focused on matters that occurred in the past and do not address whether the 2009 Final Rule itself can withstand scrutiny. One of the main components of the regulatory framework proposed by the state of Wyoming that fails to pass muster with FWS is the State's refusal to designate the wolf as a trophy game animal in the entire state of Wyoming, rather than the dual status approach that has been proposed. Wyoming's plan provides that in over 88% of the state of Wyoming the wolf will be designated as a predator. In the predatory animal area, wolves may be taken by anyone, anywhere at any time without limit and by nearly any means. FWS asserts that wolves are very susceptible to this type of unregulated human-caused mortality and that it utilized its scientific expertise and relied on actual data to conclude that wolves will be unable to persist within the predatory animal area in Wyoming. Most of the wolves in the predatory animal area were killed within a few weeks of losing the ESA's protection with the earlier delisting rule, prior to issuance of the Montana district court's preliminary injunction and before reinstatement of the prior rule.

FWS contends gray wolf regulation depends entirely on the size,

16

permanence and management regime within the trophy game area. Wyoming's trophy game animal designation allows for the regulation of the methods of take, hunting seasons, types of allowed takes and numbers of wolves that could be killed. The trophy game area established in Wyoming contains over 12,000 square miles in northwestern Wyoming and includes the National Parks, forest service designated wilderness lands, and adjacent public and private lands. The state has no management responsibility in the National Parks (approximately one-third of the trophy game area), and thus, the initial trophy game area provides for some state management and regulation in only about 8% of the state.

However, if delisting occurs, the government contends that under Wyo. Stat. § 23-1-101(b), the size of the trophy game area is immediately reduced and the trophy game area can be further diminished "if the commission determines the diminution does not impede the delisting of gray wolves and will facilitate Wyoming's management of wolves." Wyoming law provides for aggressive control of wolves rather than protection and conservation of wolves. See Wyo. Stat. § 23-1-304(e), (j). The Wyoming Game and Fish Department ("WGFD") is charged with setting boundaries for the trophy game area as minimally as possible, to ensure boundaries are "only as necessary to

reasonably ensure at least seven (7) breeding pairs of gray wolves" are located outside of the National Parks. Wyo. Stat. § 23-1-304(a).

The agency asserts that Wyoming law also requires lethal control of wolves, Wyo. Stat. § 23-1-304(m), and requires liberal issuance of kill permits as long as there are seven breeding pairs within the state and outside of the National Parks regardless of the year-end status of wolves. Wyoming broadly defines circumstances when lethal take permits are issued, including when wolves harass livestock. In the government's view, harassment cannot be confirmed and leads to unlimited permits for lethal take when 7 breeding pairs exist primarily outside of the National Parks.

FWS states that on March 13, 2008, WGFC issued regulations effectively classifying the entire trophy game area as a "chronic wolf predation area," paving the way for issuance of lethal take permits until the wolf population falls below seven breeding pairs outside of the National Parks. WGFD liberally issued lethal take permits after ESA protections were removed in 2008. Although corrective action was attempted with substantially revised regulations, FWS noted that the March 13 regulations demonstrate that the framework established by state law allows Wyoming to reduce the wolf population outside the National Parks to 6 breeding pairs regardless of whether the year-end wolf

population would be below 7 breeding pairs outside the National Parks or 15 breeding pairs or 150 wolves statewide. These, with other factors, show that Wyoming has passed a state law significantly limiting WGFD's options for professional wolf management. The state law provides that the wolf population would be deliberately managed down to absolute bare minimum levels necessary for recovery. Wolves from within the trophy game area will be subjected to unregulated mortality in the predatory animal area. FWS argues it rationally concluded that death following dispersal into the predatory animal area constitutes additional unregulated mortality, likely to further reduce a wolf population that has been held at minimum levels in the trophy game area.[2]

---

[2]In the 2009 Final Rule, 74 Fed. Reg. at 15135, the FWS indicated that "[b]y the end of 2008, the NRM gray wolf population included approximately 1,639 NRM wolves (491 in Montana; 846 in Idaho; 302 in Wyoming) in 95 breeding pairs (34 in Montana; 39 in Idaho; 22 in Wyoming). The wolf population estimate for 2008 is slightly higher than that for 2007, indicating a declining rate of increase as suitable habitat becomes increasingly saturated with resident wolf packs.

From 1995 to 2008, the NRM wolf population increased an average of about 22 percent annually with increases ranging from 8 to 50 percent (Service *et al.* 2009, Table 4). In 2008, the overall population increased at the slowest rate since 1995. . . ."

In its Rocky Mountain Wolf Recovery 2008 Interagency Annual Report, the FWS disclosed by the end of 2008, the NRM wolf population was estimated to contain about 1,645 wolves in 217 packs, with 95 of these packs classified as breeding pairs. AR 2009-40937-38.

The NRM DPS wolf population was officially delisted from March 28 to
(continued...)

19

FWS also contends that other sources of mortality and aspects of the Wyoming scheme show that management at minimum levels is unlikely to maintain recovery of the species. Wyoming's defense of property law provides property owners may, without obtaining state authorization, kill any wolf doing damage to private property. Wyo. Stat. § 23-3-115(a). The trophy game area contains private property; defense of property killings cannot be regulated under Wyoming law and defense of property take consistently occurs in the NRM region. Illegal killing of wolves also occurs and cannot be controlled. The government argues these collective periodic and uncontrollable sources of wolf mortality, in conjunction with management to bare minimum levels, are likely to push the Wyoming wolf population below minimum recovery levels.

FWS asserts Wyoming's regulatory framework does not provide for the maintenance of a minimum number of wolves in the state, which is a critical component of the FWS recovery criteria. The recovery criteria contain both a breeding pair and a number of wolves component. A wolf population encompassing both wolf packs and individual wolves, in addition to breeding pairs, is critical to maintaining the resiliency of the population to threats such

---

[2](...continued)
July 18, 2008. AR 2009-40951.

as human caused mortality. By requiring aggressive management as long as 7 breeding pairs live primarily outside of the National Parks, Wyoming's trophy game area population could contain only 28 wolves, as a minimum of 4 wolves are needed for a breeding pair. Although each breeding pair presently represents 14 wolves in the NRM under federal protections, additional sources of mortality and pressure under state management such as hunting and increased control actions can influence and possibly decrease pack size. The United States asserts that the FWS's findings are reasoned, supported by the record, and should be afforded due deference.

Petitioners have argued that the statements of FWS acknowledge that a dual-status approach would not necessarily prevent Wyoming from maintaining a recovered wolf population. This argument is erroneous, in the government's view, in that the FWS has repeatedly emphasized that the adequacy of any dual-status approach depends on the size, permanence and management of wolves within the trophy game area and states that the trophy game area is barely good enough only if wolf mortality in the trophy area is very conservative. Other factors remain important, including the explanation that the current predatory animal area, in conjunction with the size, potential diminution of and aggressive control within the trophy game area, is insufficient

to maintain a biologically recovered wolf population.   The petitioners have simply disregarded the context of FWS's past statements.

Petitioners have relied on peer review statements made in the context of prior rulemaking to demonstrate that Wyoming's current regulatory scheme is adequate to maintain a recovered wolf population.  Contrary to their claims, the government contends that many of the peer reviewers disagreed with and did not endorse Wyoming's plan and also raised biological concerns with the Wyoming management approach expressed in the 2009 Final Rule.  The peer reviewers did not review Wyoming's current law, its consistency with Wyoming's regulations and plan or FWS's detailed scientific analysis in the 2009 Final Rule. Those peer reviews should not undermine the analysis in the 2009 Final Rule or render it arbitrary and capricious.  Petitioners fail to identify any statement by Mr. Bangs or any other agency expert that disagrees with or disputes the scientific conclusions in the 2009 Final Rule.  In such circumstances FWS has discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989); Ecology Ctr. v. U.S. Forest Serv., 451 F.3d 1183, 1188-1189 (10th Cir. 2006).

The government asserts that it reasonably concluded that Wyoming's

regulatory scheme is not likely to maintain genetic or demographic connectivity. The Wyoming regulatory scheme, FWS concluded in the 2009 Final Rule, would cut off all dispersal and interchange between central Idaho and Wyoming. The Greater Yellowstone Area ("GYA") is the most isolated population within the NRM DPS. For the GYA to be genetically and demographically viable, wolves "must be able to traverse large portions of it for extended periods of time, to survive long enough to find a mate in suitable habitat and reproduce." 74 Fed. Reg. at 15176. While exact migration corridors are not known, the best available scientific data indicates that wolves dispersing between central Idaho and Wyoming likely use Wyoming's predatory animal area (citing the Oakleaf and Boyd studies). Thus, FWS asserts it reasonably found wolves dispersing into the GYA would likely disperse and temporarily live in the predatory animal area.

The government argues that the petitioners' arguments regarding the scientific issues lack merit. They provide no record support for their claim that "having a predator classification for wolves" in 88% of Wyoming "absolutely will not limit wolf movements between the three states." FWS argues that it provided a reasoned explanation for its decision and its decision is entitled to deference. The FWS disputes that any heightened scrutiny is appropriate

because the 2009 Rule is allegedly inconsistent with FWS's approval of Wyoming's plan in 2008. In Fox Television Stations, 129 S.Ct. 1800, 1810 (2009), the Supreme Court held that an agency rule is not subject to any "heightened" review because it may conflict with past agency decisions. Rather, the court held an agency must provide a reasoned explanation for its action, and where necessary, display awareness that it is changing position, citing Fox Television, 129 S.Ct. at 1810. This reasoned explanation is provided so that a reviewing court may understand the basis for the agency's action and judge the consistency of that action with the agency's mandate.

The agency asserts that was accomplished in this case. It reevaluated and provided a reasoned explanation in full awareness and consideration of its 2008 approval of Wyoming's wolf management plan. It explained that it had approved the 2008 plan because the trophy game area included 70% of the State's suitable wolf habitat and was "presumed large enough to support Wyoming's share of a recovered wolf population." However, subsequent events, such as Wyoming's March 13, 2008 regulations and the Montana district court's preliminary injunction order, led to reassessment of Wyoming's laws, regulations and management plan. This reevaluation identified shortcomings in the regulatory regime, such as the effects of state law on the WGFD's ability

24

to adaptively manage wolves to meet minimum recovery goals and the effects
of the predatory animal area on maintaining a wolf population above recovery
levels and maintaining connectivity with other NRM populations. FWS cannot
rest on prior analysis it knows has been found inadequate. The efforts of
petitioners to prevent FWS from re-evaluating past decisions should be
rejected.

Petitioners have also argued that the guidance offered prior to the 2009
Final Rule renders the 2009 Final Rule arbitrary and capricious. The agency
contends that this argument ignores FWS's analysis and explanation why the
Wyoming scheme is not adequate. This guidance was informal advice.
Although FWS offered guidance to Wyoming, further efforts and analysis must
occur prior to removing ESA protections in Wyoming. The guidance did not
constitute a basis for FWS's findings. The guidance is not material to the issues
before this Court, as it has not been adopted and has not rejected a plan
adopting this guidance. The guidance merely reflects deficiencies identified in
Wyoming's existing regulatory regime and has no independent legal effect. The
recommendation that Wyoming adopt a state-wide trophy game area bears on
the issue, as a state-wide trophy game area would allow WGFD to adaptively
manage wolf populations throughout their range. The recommendation of an

additional "7 breeding pair and 70 wolf" standard, if adopted, would facilitate maintenance of both minimum population levels and the full spectrum of biologically important components in wolf populations (breeding pairs, packs and individual wolves).

FWS argues it did appropriately consider Wyoming's Chapter 21 regulations and 2008 plan to cure deficiencies in the regulatory framework. FWS explained the emergency Chapter 21 regulations were temporary and contingent on future action.  74 Fed. Reg. at 15171-72.[3]  The regulatory improvements do not address the legislative shortcomings FWS identified and evaluated in the 2009 Rule.  This includes, for example, the FWS explanation that Wyoming's 2008 plan and Chapter 21 regulations commit to maintaining connectivity, but the predatory animal area and other aspects of state law preclude that commitment from becoming a reality.  While the emergency Chapter 21 regulations identify a larger trophy game area, state law dictates the trophy game area is immediately reduced in size from and after the date gray wolves are removed from the ESA's protections.  Wyo. Stat. § 23-1-

---

[3]The emergency regulations were dated and signed October 27, 2008; the final Chapter 21 regulations are dated January 29, 2009, with a stated effective date of 3/12/2009.  The agency's 2009 Final Rule was published in the Federal Register April 2, 2009.

101(a)(xvii)(B)(I). FWS appropriately identified conflicts and inconsistencies between Wyoming law, the Chapter 21 regulations and the 2008 plan.

FWS asserts it cannot ignore state law or simply defer to Wyoming's comments as to why state law is sufficiently protective of gray wolves. The plain language of the statute instructs the agency to consider "existing regulatory mechanisms," 16 U.S.C. § 1533(a)(1)(D), including mechanisms created by other agencies of government. The plain language of the ESA affords FWS discretion to disagree with and issue regulations inconsistent with the comments or petition of a state.

FWS further argues it did not rely on improper factors in issuing the 2009 Final Rule. All of the comments referenced by petitioners/intervenors citing agency statements in support of their argument that non-biological factors influenced the FWS's decision in the 2009 Final Rule were made in the context of past decisions, such as FWS's 2004 letter. The agency suggests that the petitioners have disregarded the stated basis for the 2009 Final Rule and have identified no evidence in the record that FWS actually relied on improper factors here. Finally, the best scientific and commercial data available mandate does not bar FWS from considering human tolerance and public attitudes. Public attitudes and human tolerance led to the excessive human-caused mortality

that extirpated the species from the NRM region by the 1930s, showing these factors can have serious biological consequences for wolves. The ESA's listing and delisting factors include considerations of manmade factors affecting the species' continued existence and overutilization and human factors are relevant and valid considerations under the ESA.

In the Joint Reply of the State and County, the petitioners reiterate that rejection of the proposed wolf management scheme is arbitrary and capricious and that FWS's interpretation of provisions in the Wyoming wolf management statutes is incorrect. They contend that the scheme unambiguously commits the state to maintain at least 15 breeding pairs and at least 150 wolves in Wyoming after delisting. The petitioners assert that the statutes do not automatically diminish the trophy game area to a size that would not have been adequate to allow for delisting and instead only allow diminution if the commission determines the diminution does not impede the delisting and will facilitate the state's management of wolves. The state's discretionary authority in managing wolves after delisting is limited, and the statutes were enacted with the intent that the wolf population in Wyoming be managed so that wolves are not relisted in the future.

Additionally, the petitioners argue that the changes demanded by FWS

regarding the wolf management scheme are not mere guidance. The five changes that were required to be made in order to find the regulatory scheme to be an adequate regulatory mechanism were outlined at 74 Fed. Reg. at 15179. The FWS stated in the 2009 Final Rule that the Wyoming regulatory framework does not provide adequate regulatory mechanisms to assure that Wyoming's share of a recovered NRM wolf population would be conserved if the protections of the ESA were removed. It then, in the Final Rule, listed five conditions that would have to be met to satisfy requirements for delisting in Wyoming. Thus, the petitioners suggest that the argument that the demanded changes are only guidance and not the basis for the FWS decision not to delist is "disingenuous and factually incorrect." Document 32, at 27.

The WWC argues in its reply that the Wyoming plan meets the ESA requirements for delisting; that misrepresentations regarding the recovery area and the Wyoming plan exist; that the FWS's demands are without basis; and that the government's arguments are based on speculation. WWC adopted and incorporated by reference the state and county's reply brief and noted that it intended to focus upon the decisions of the FWS based on the relevant historical and scientific context of the dispute. Document 33 at 3, n.1. The WWC asks that the FWS be required to approve the Wyoming wolf management plan.

## Introduction

### Thinking Like A Mountain
by Aldo Leopold

A deep chesty bawl echoes from rimrock to rimrock, rolls down the mountain, and fades into the far blackness of the night. It is an outburst of wild defiant sorrow, and of contempt for all the adversities of the world. Every living thing (and perhaps many a dead one as well) pays heed to that call. To the deer it is a reminder of the way of all flesh, to the pine a forecast of midnight scuffles and of blood upon the snow, to the coyote a promise of gleanings to come, to the cowman a threat of red ink at the bank, to the hunter a challenge of fang against bullet. Yet behind these obvious and immediate hopes and fears there lies a deeper meaning, known only to the mountain itself. Only the mountain has lived long enough to listen objectively to the howl of a wolf.

Those unable to decipher the hidden meaning know nevertheless that it is there, for it is felt in all wolf country, and distinguishes that country from all other land. It tingles in the spine of all who hear wolves by night, or who scan their tracks by day. Even without sight or sound of wolf, it is implicit in a hundred small events: the midnight whinny of a pack horse, the rattle of rolling rocks, the bound of a fleeing deer, the way shadows lie under the spruces. Only the ineducable tyro can fail to sense the presence or absence of wolves, or the fact that mountains have a secret opinion about them.

My own conviction on this score dates from the day I saw a wolf die. We were eating lunch on a high rimrock, at the foot of which a turbulent river elbowed its way. We saw what we thought was a doe fording the torrent, her breast awash in white water. When she climbed the bank toward us and shook out her tail, we realized our error: it was a wolf. A half-dozen others, evidently grown pups, sprang from the willows and all joined in a welcoming melee of wagging tails and playful maulings. What was literally a

30

pile of wolves writhed and tumbled in the center of an open flat at the foot of our rimrock.

In those days we had never heard of passing up a chance to kill a wolf. In a second we were pumping lead into the pack, but with more excitement than accuracy: how to aim a steep downhill shot is always confusing. When our rifles were empty, the old wolf was down, and a pup was dragging a leg into impassable slide-rocks.

We reached the old wolf in time to watch a fierce green fire dying in her eyes. I realized then, and have known ever since, that there was something new to me in those eyes - something known only to her and to the mountain. I was young then, and full of trigger-itch; I thought that because fewer wolves meant more deer, that no wolves would mean hunters' paradise. But after seeing the green fire die, I sensed that neither the wolf nor the mountain agreed with such a view.

Since then I have lived to see state after state extirpate its wolves. I have watched the face of many a newly wolfless mountain, and seen the south-facing slopes wrinkle with a maze of new deer trails. I have seen every edible bush and seedling browsed, first to anaemic desuetude, and then to death. I have seen every edible tree defoliated to the height of a saddlehorn. Such a mountain looks as if someone had given God a new pruning shears, and forbidden Him all other exercise. In the end the starved bones of the hoped-for deer herd, dead of its own too-much, bleach with the bones of the dead sage, or molder under the high-lined junipers.

I now suspect that just as a deer herd lives in mortal fear of its wolves, so does a mountain live in mortal fear of its deer. And perhaps with better cause, for while a buck pulled down by wolves can be replaced in two or three years, a range pulled down by too many deer may fail of replacement in as many decades. So also with cows. The cowman who cleans his range of wolves does not

31

realize that he is taking over the wolf's job of trimming the herd to fit the range. He has not learned to think like a mountain. Hence we have dustbowls, and rivers washing the future into the sea.

We all strive for safety, prosperity, comfort, long life, and dullness. The deer strives with his supple legs, the cowman with trap and poison, the statesman with pen, the most of us with machines, votes, and dollars, but it all comes to the same thing: peace in our time. A measure of success in this is all well enough, and perhaps is a requisite to objective thinking, but too much safety seems to yield only danger in the long run. Perhaps this is behind Thoreau's dictum: In wildness is the salvation of the world. Perhaps this is the hidden meaning in the howl of the wolf, long known among mountains, but seldom perceived among men.

ALDO LEOPOLD, A SAND COUNTY ALMANAC, AND SKETCHES HERE AND THERE, Thinking

Like a Mountain, at 129-133, Commemorative edition 1989, ©1949, Oxford

University Press, Inc.

## Discussion

The Endangered Species Act begins the analysis in this case.  16 U.S.C.

§ 1531 (b), entitled "Purposes" provides:

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

32

The statute declares policy in subsection (c):

> (1) It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.
> * * * *

Certain definitions apply, and are set forth in 16 U.S.C. § 1532, including:

> (3) The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.
>
> * * * *
>
> (16) The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.
>
> * * * *
>
> (19) The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct.
>
> (20) The term "threatened species" means any species which is likely to become an endangered species within the

33

foreseeable future through all or a significant portion of its range.

Section 1533(a) enumerates five factors that are to be applied in

determining whether a species is endangered or threatened because of those

factors. The statute provides:

(1) The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

The statute states the basis for such determinations in 15 U.S.C. 1533(b):

(1)(A) The Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its

34

jurisdiction.

15 U.S.C. § 1533(b)(3)(A) provides:

To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

The Act also addresses experimental populations in 16 U.S.C. § 1539(j):

(1) For purposes of this subsection, the term "experimental population" means any population (including any offspring arising solely therefrom) authorized by the Secretary for release under paragraph (23), but only when, and at such times as, the population is wholly separate geographically from nonexperimental populations of the same species.

(2)(A) The Secretary may authorize the release (and the related transportation) of any population (including eggs, propagules, or individuals) of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species.

(B) Before authorizing the release of any population under subparagraph (A), the Secretary shall by regulation identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened

species.

In 1978, the Secretary listed the entire gray wolf species as endangered

in the lower forty-eight states, except Minnesota.  Wyoming Farm Bureau

Federation v. Babbitt, 199 F.3d 1224,  1228 (10th Cir. 2000).

> In 1980, a team organized by the Department of Interior completed its Northern Rocky Mountain Wolf Recovery Plan ("Recovery Plan"), pursuant to the Endangered Species Act. The Department updated the Recovery Plan in 1987 to recommend the introduction of at least ten breeding pairs of wolves for three consecutive years in each of three identified recovery areas (Yellowstone National Park, central Idaho and northwestern Montana).

Id.

> The 1987 Recovery Plan states:
>
> PRIMARY OBJECTIVE:  To remove the Northern Rocky Mountain wolf from the endangered and threatened species list by securing and maintaining a minimum of 10 breeding pairs in each of three recovery areas for a minimum of 3 successive years.
>
> SECONDARY OBJECTIVE:   To reclassify the Northern Rocky Mountain wolf to threatened status over its entire range by securing and maintaining a minimum of 10 breeding pairs in each of two recovery areas for a minimum of 3 successive years.
>
> TERTIARY OBJECTIVE:  To reclassify the Northern Rocky Mountain wolf to threatened status in an individual recovery area by securing and maintaining a minimum of 10 breeding pairs in the recovery area for a minimum of 3 successive years.  Consideration will also be given to reclassifying such a population to threatened under similarity of appearance after the tertiary objective for the

> population has been achieved and verified, special regulations are
> established, and a State management plan is in place for that
> population.

Document 28-2 at 8, Bates No. 00914.

The recovery plan delineated recovery areas and identified and developed

conservation strategies and management plan(s) to ensure perpetuation of the

Northern Rocky Mountain (sometimes "NRM") gray wolf.    Potential wolf

recovery areas included northwestern Montana recovery area, Idaho recovery

area and Yellowstone recovery area.  Document 28-3 at 9, Bates No. 00915.

Recovery goals for a threatened and fully recovered population were to be

evaluated and verified.  Document 28-3 at 17.  When achieved, the Service and

recovery team believed these recovery goals would allow reclassification of the

Northern Rocky Mountain wolf from endangered to threatened status and

eventual delisting.   The population goals could be revised as, or if, new

information on the number of wolves necessary to maintain a viable, self

sustaining Northern Rocky Mountain wolf population became available.  The

NRM wolf was to be reclassified or delisted when the population levels and/or

parameters were verified and achieved.  When the tertiary and/or secondary

objectives were reached, the NRM wolf would be considered eligible for

reclassification to threatened status over its entire range when two wolf

recovery areas each have populations consisting of 10 breeding pairs for a

minimum of 3 consecutive years.  The wolf population in an individual recovery

area would be considered eligible for reclassification to threatened status when

it consisted of 10 breeding pairs for a minimum of 3 consecutive years.  Id.

Management zones to provide for wolf recovery and minimize wolf-human

conflicts were established, and dispersal corridors were addressed:

> Due to topographical features, these areas are the logical routes
> wolves may use in moving from Canada into Idaho or Montana, or
> in between recovery areas.  Such corridors may or may not be
> currently occupied by transient or resident wolves.   Wolf
> management in these areas would not be geared toward
> establishing minimum viable population levels because of the
> potential for conflicts with other land uses.   These areas are
> particularly important in association with recovery areas where
> natural recruitment is relied upon to meet recovery objectives.
> Corridors may also be important in maintaining gene flow between
> populations in the future. Monitoring of the recovery program may
> over time indicate a need for analyzing the costs/impacts of
> maintaining the integrity of dispersal corridors versus reintroducing
> wolves into a recovery area and periodically augmenting the
> population to promote gene exchange.  Identification of dispersal
> corridors in Zone III is not expected or intended to curtail multiple-
> use management.

Id., Document 28-3 at 27, Bates No. 00933.

The 1987 recovery plan required development and implementation of a

wolf control/contingency plan for dealing with wolf depredation problems.  Id.,

Document 28-3 at 29, Bates No. 00935.  The plan required coordination and

integration of wolf management objectives with state big game management objectives. Id., Document 28-3 at 32, Bates No. 00938-39. It also indicated that state regulations should be developed and implemented to govern the regulated hunting/trapping of delisted wolves. "Upon delisting, if the wolf has not already been classified as a game animal or furbearer (or protected species), the State wildlife agencies should do so. State biologists should develop draft regulations for seasons, limits and methods of take and submit these regulations to the appropriate State conservation commission(s) for approval. Regulations should be implemented and enforced and monitoring of numbers of permits issued, animals taken, locations of take, etc., initiated. Adjustments should be made, as necessary, in the State regulations for 'taking.'" Id., Document 28-3 at 38, Bates No. 00944.

The recovery plan defined "[t]ake" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, collect, or attempt to engage in such conduct." Id., Document 28-3 at 54, Bates No. 00960. A "viable wolf population" is defined as "[a] self-supporting population of wolves with sufficient numbers to ensure the species will not become threatened, endangered, or extinct. For this document, a viable wolf population shall exist in the northern Rocky Mountain area when 30 breeding pairs of wolves are

maintained in three designated recovery areas for a minimum of 3 successive years. A minimum of 10 pairs must be maintained in each of the three recovery areas." Id., Document 28-3 at 55, Bates No. 00961. The "zone management concept" was described as "[a] management concept by which management priority and concern is de-emphasized beyond a central core area. For this document there will be three management zones: Zone I will give strong emphasis to wolf recovery; Zone II will be a buffer zone; and Zone III will contain established human activities such as domestic livestock use or developments in sufficient degree as to render wolf presence undesirable. Maintenance and improvement of habitat for wolves are not management considerations in Zone III." Id. The NRM wolf population achieved its numerical, distributional, and temporal recovery goals at the end of 2002. 74 Fed. Reg. at 15124.

The Final Environmental Impact Statement regarding reintroduction of wolves into Yellowstone National Park and central Idaho is dated April 14, 1994. The FEIS provided a list of counties or portions of counties included in the Yellowstone and central Idaho primary analysis areas in Idaho, Montana, and Wyoming:

- Yellowstone Area: (Idaho) Bonneville, Fremont, Madison, Teton;

(Wyoming) Fremont, Hot Springs, Lincoln, Park, Sublette, and

Teton;

- Montana: Beaverhead, Carbon, Gallatin, Madison, Park, Stillwater,

    Sweetgrass;

- Central Idaho Area:  (Idaho) Blaine, Boise, Camas, Clearwater,

    Custer, Elmore, Idaho, Lemhi, Shoshone, and Valley.

The stated "Purpose of the Action" is as follows:

The U.S. Fish and Wildlife Service (FWS) proposes to recover, and
then delist (remove from federal protection), the gray wolf (*Canis
lupus*) in the northern Rocky Mountains by establishing a minimum
of ten breeding pairs of gray wolves, for three consecutive years,
in (1) central Idaho and (2) the greater Yellowstone area. Wolves
have been dispersing naturally into northwestern Montana and
have established a population that should reach recovery levels
about 2002.  The Yellowstone and central Idaho areas represent
two of three wolf recovery areas in the northern Rocky Mountains
of the United States (U.W.) [sic] that were identified in the 1987
Northern Rocky Mountain Wolf Recovery Plan as being necessary
for the recovery and conservation of endangered gray wolves, but
wolf populations do not currently exist in these areas.    This
proposal covers only the Yellowstone and central Idaho areas.

FEIS at 1.

When this saga began, as noted in the FEIS, the wolf was listed as a

predator in Wyoming (W.S. § 23-1-101 VIII), and under state statute (W.S. §

23-3-103), could be taken at any time without limit.  There was then no

41

reporting requirement for killing a wolf and the Wyoming Game and Fish Department had no authority to manage wolves. FEIS at 6.

Several years later, on February 8, 2006, the FWS published notice of intent to conduct rulemaking to establish a Northern Rocky Mountain Distinct Population Segment (NRM DPS). 71 Fed. Reg. 6634 (Feb. 8, 2006). In the promulgated rule, FWS indicated it was considering Wyoming's delisting petition, and stated that it believed Wyoming's 2003 law and wolf management plan were inadequate to assure the maintenance of a recovered population in the state. On August 1, 2006, the FWS issued a 12 month finding concluding that removing the DPS from the protections of the Endangered Species Act was not warranted. 71 Fed. Reg. 43410 (Aug. 1, 2006). It also determined that Wyoming's then-current regulatory framework was not adequate to maintain Wyoming's numerical and distributional share of the NRM wolf population. 71 Fed. Reg. 43416. It believed that "[a]ttempting to manage a wolf population that is constantly maintained at minimum levels would likely result in a wolf population falling below recovery levels due to factors beyond the Wyoming Game and Fish Department's control." 71 Fed. Reg. 43428. It also stated that, although "most [of the 2003 peer] reviewers believed the coordinated implementation of all three State plans would be adequate," there were

42

changes and new factors not reviewed by the peer reviewers, including the

decline of the YNP wolf population in 2005. 71 Fed. Reg. at 43415.

The FWS Final Rule was published at 73 Fed. Reg. 10514, dated

Wednesday, February 27, 2008. In that 2008 Final Rule, the FWS opened with

the following summary, stating:

> Based on the best scientific and commercial data available, the
> NRM DPS is no longer an endangered or threatened species
> pursuant to the Endangered Species Act of 1973, as amended (Act)
> (16 U.S.C. 1531 et seq.). The NRM DPS has exceeded its biological
> recovery goals, and all threats in the foreseeable future have been
> sufficiently reduced or eliminated.
>
> The States of Idaho (2002) and Montana (2003) adopted State
> laws and management plans that meet the requirements of the Act
> and will conserve a recovered wolf population into the foreseeable
> future. In 2007, following a change in State law, Wyoming drafted
> and approved a revised wolf management plan (Wyoming 2007).
> We have determined that this plan meets the requirements of the
> Act as providing adequate regulatory protections to conserve
> Wyoming's portion of a recovered wolf population into the
> foreseeable future. Our determination is conditional upon the 2007
> Wyoming wolf management law (W.S. 11-6-302 et seq. and
> 23-1-101, et seq. in House Bill 0213) being fully in effect and the
> wolf management plan being legally authorized by Wyoming
> statutes. If the law is not in effect (discussed in more detail below)
> within 20 days from the date of this publication, we will withdraw
> this final rule and replace it with an alternate final rule that
> removes the Act's protections throughout all of the DPS, except the
> significant portion of the gray wolf's range in northwestern
> Wyoming outside the National Parks.

73 Fed. Reg. 10514. Further:

On February 8, 2007, we proposed to designate the NRM DPS of the gray wolf and to delist all or most portions of the NRM DPS (72 FR 6106). Specifically, we proposed to delist wolves in Montana, Idaho, and Wyoming, and parts of Washington, Oregon, and Utah. The proposal noted that the area in northwestern Wyoming outside the National Parks (i.e., YNP, Grand Teton National Park, and John D. Rockefeller Memorial Parkway) would only be delisted in the final rule if adequate State regulatory mechanisms were developed. On July 6, 2007, the Service extended the comment period in order to consider a 2007 revised Wyoming wolf management plan and State law that we believed, if implemented, could allow the wolves in northwestern Wyoming to be removed from the List of Endangered and Threatened Wildlife (72 FR 36939). On November 16, 2007, the WGFC unanimously approved the 2007 Wyoming Plan (Cleveland 2007, p. 1). We then determined this plan provides adequate regulatory protections to conserve Wyoming's portion of a recovered wolf population into the foreseeable future (Hall 2007, p. 1-2). Our determination was conditional upon the 2007 Wyoming wolf management law being fully in effect and the wolf management plan being legally authorized by Wyoming statutes. The plan automatically goes into effect upon the Governor's certification to the Wyoming Secretary of State that all of the provisions found in the 2007 Wyoming wolf management law have been met (W.S. §§ 23-1-101 et sec.; discussed in further detail in Factor D below) (Freudenthal 2007b, p. 1-3).

73 Fed. Reg. 10514, 10515.

Genetic considerations were addressed in the FWS analysis of Factor E,

at 73 Fed. Reg. 10514, 10553-10554:

Genetic Considerations — The genetic diversity of wolves in North America was reduced by the historic large-scale extirpation of wolves in North America (Leonard et al. 2005, p. 9), but populations have rebounded from previously low levels and even the relatively inbred Mexican wolf (Fredrickson et al. 2007) is not

threatened by reduced genetic diversity alone. Even a wolf population on Isle Royale National Park that started from possibly 2 founders in 1949 and remained very small (<50 wolves) has persisted until the present time (Boitani 2003, p. 330). The wolf population on the island-like Kenai Peninsula, Alaska, was recolonized by a few wolves in the 1960's. That population is removed from other populations, has remained small (<200 wolves), is hunted and trapped, doesn't appear threatened (Peterson et al. 1994, p. 1), and is genetically fit (Talbot and Scribner 1997, p. 20-21). Small wolf populations are unlikely to be threatened solely by loss of genetic diversity, but that possibility exists (Boitani 2003, p. 330). Many extant wolf populations have persisted for many decades or centuries with low genetic diversity (Boitani 2003, pp. 322-03, 330-1; Fritts and Carbyn 1996). Furthermore, from a purely biological perspective, the NRM DPS is just the southern extension of a vast North American wolf population consisting of many tens of thousands of individuals.

We asked a wolf genetics expert who was a peer reviewer on the Service's 2006 proposal to delist the WGL wolf population (Wayne 2006), whose team we had contracted to do a genetic analysis of wolves in the NRM, to comment on our proposal (Wayne 2007). We did not ask him to be one of the peer reviewers for this proposal because of that potential conflict of interest. He and his colleagues mistakenly believed the Service's recovery goals were to have only 10 breeding pairs and 100 wolves in each of the three States and were unaware of the States' intentions to manage for about 883-1,250 wolves in mid-winter. Based on this belief they concluded that the YNP wolf population was less than what would be required for maintaining a genetically healthy, self-sustaining metapopulation. They believed it was too low given the wolf population's current higher population level, and that the current genetic isolation of YNP and potentially the GYA from the other recovery areas and Canada would reduce the genetic integrity of the YNP segment of the NRM wolf population, within 100 years. We carefully examined all those claims and determined those related to the GYA were based on faulty assumptions, unjustifiably

45

pessimistic forecasts, and therefore we respectfully disagreed with them for the reasons stated below.

Genetic diversity throughout the NRM is currently very high (Forbes and Boyd 1996, p. 1084; Forbes and Boyd 1997, p. 226; vonHoldt et al. 2007, p. 19) and likely to remain so especially in the northwestern Montana and central Idaho core recovery areas, because wolf packs are relatively contiguous throughout those areas and into Canada where wolf packs are numerous and contiguous northward to the Arctic Ocean (Service et al. 2007, Figure 1). However, the theoretical modeling by von Holdt et al. (2007; Figure 8) indicated that under a worst-case scenario in 100 years the genetic diversity of wolves in YNP would be reduced if it were totally isolated from the GYA and the GYA was totally isolated from the other core recovery areas. That lower genetic diversity might result in an average of 4 pups being born into each pack rather than the current 5 per pack. That would certainly not threaten or even reduce the number of wolves in YNP which will continue to have an adult survival rate of around 80%, but lower pup production might theoretically reduce the rates of wolf dispersal from the Park. However, the model's assumptions are misleading. Delisting will not affect wolves in YNP and YNP is at the center of the GYA core recovery area that is composed of wolves in YNP as well as those outside of YNP in northwestern Wyoming, southwestern Montana, and to a lesser extent southeastern Idaho. Modeling and field data suggest that low-density wolf populations have a reduced probability of finding mates (Hurford et al. 2006; Brainerd et al. 2008), so having a high-density core refugium for wolves like YNP as the cornerstone of the GYA core recovery area is fortuitous and provides for a much larger and well-dispersed wolf population than the one modeled and upon which the von Holdt et al. (2007) paper based their predictions.

Wolves have naturally dispersed into the GYA. In 1992, an uncollared black wolf from northwestern Montana was shot just south of YNP (Fain 2007, p. 1). Another black wolf was filmed in YNP a month before that shooting, but has never been reported

46

again. It is unknown if it was the same or a different wolf. Since 1995, we have documented dispersal of wolves to the GYA on at least four occasions by radio-collared wolves from Idaho. One was likely the alpha male of the Greybull pack near Meeteetse, WY. Recently a dispersing radio-collared male from Idaho has paired with a female in YNP (Service 2007b). Two other radio-collared wolves dispersed into the GYA from Idaho but were not suspected of breeding. Other wolves from Idaho or northwestern Montana have undoubtedly made the journey to the GYA since 1995 but have not been detected simply because they were not uniquely marked or tracked with radio telemetry (an average of only 30% of the wolf population is marked). However, while genetic studies are continuing, at this time no genes from offspring of a wolf dispersing from central Idaho or northwestern Montana into the GYA have been detected in the samples that have been analyzed (Wayne 2007). In other words, although 4-12 individual wolves have naturally dispersed into the GYA, to date little, if any, of their DNA has become incorporated into the GYA portion of the NRM DPS. If no new genes ever entered the GYA in the next 100 years (either naturally or by agency relocations), the GYA wolf population's currently high genetic diversity would be reduced, but not to the point the GYA wolf population would be threatened because other wolf populations have persisted at lower levels and with lower genetic diversity for decades or centuries.

The potential lack of genetic connectivity between wolves in YNP and wolves in the rest of the NRM DPS is not considered a threat under the Act's criteria for persistence, because much smaller extant wolf populations with much lower genetic diversity have persisted for decades or even centuries (See Fritts and Carbyn 1995, p. 33; Boitiani 2003, pp. 330-335; Liberg 2005, pp. 5-6 for examples). Furthermore, if wolves select breeders for genetic differences, as data indicate (wolves have a strong tendency to select mates that will minimize inbreeding) (Bensch et al. 2006, p. 72; vonHoldt et al. 2007, p. 1), then future dispersers into a system experiencing genetic inbreeding would be much more likely to have their genes strongly selected for and incorporated into the

47

inbred population. In addition, Montana (2003, p. 35), Idaho (2007, p. 20), and Wyoming (2007, p. 17) committed to foster successful dispersal by maintaining a widely-dispersed wolf population over 45 breeding pairs and 450 wolves, continuing to work toward resolving wildlife connectivity issues in the NRM DPS, including the maintenance of traditional ranching/open space, and if necessary relocate wolves or use other measures if reduced genetic diversity ever threatened wolf population recovery. Many small populations with low genetic diversity expanded rapidly when human persecution stopped (Boitani 2003, pp. 317-340; Fritts and Carbyn 1996, pp. 31-33). As a final safeguard, which is highly unlikely to be needed, relocation has proven to be a relatively simple procedure. Genetic rescue, improved pup production, and population increases have occurred in severely inbred small wolf populations as a result of the incorporation of one or two new genetic lines/individuals (Vila et al. 2003, p. 91; Liberg et al. 2004, p. 17; Liberg 2005, pp. 5-6; Mills 2006, pp. 195-96; Fredrickson et al. 2007, p. 2365).

We agree with the conclusions of vonHoldt et al.'s (2007, pp. 18-19) that "these limitations can potentially be addressed by management actions such as increased protection, habitat restoration, and population augmentation," all things Montana, Idaho, and Wyoming have already committed to do in their wolf management plans. We also agree that genetic data should be incorporated into long-term wolf conservation efforts and are confident the States will consider all the recommendations made by vonHoldt et al. (2007, p. 19) and other scientific literature when they manage wolf numbers and distribution in the NRM DPS.

73 Fed. Reg. 10514, 10553-10554.

Thereafter, by order of July 18, 2008, the United States District Court in

Montana rejected the FWS conclusion that genetic exchange was not a

necessary component of the recovery criteria and that it had provided no new

48

evidence or research that did not exist when the recovery criteria were established. Document 27-10, at 25. The FWS "stands behind one component of the recovery criteria – 30 breeding pairs and 300 wolves – but rejects another component – genetic exchange – as unnecessary. In doing so, the Service provides no new evidence or research that did not exist when the recovery criteria were established. The Service cannot change course without reason. The change of course is especially problematic in this case because delisting will undeniably reduce the chances for future genetic exchange." Document 27-10 at 25. "Because the wolf does not meet the 1994 EIS recovery criteria and the Fish & Wildlife Service has not provided adequate reasons for rejecting those criteria, Plaintiffs are likely to succeed on their lack of connectivity claim." Id. at 26.

That court determined that the FWS acted arbitrarily and capriciously when it approved Wyoming's 2007 plan despite the State's failure to commit to managing 15 breeding pairs and the plan's malleable trophy game area. It stated, in both instances the Service altered its earlier position without providing a reasoned decision for the change based on identified new information. Document 27-10 at 5.

On October 28, 2008, the FWS reopened the comment period regarding

the February 8, 2007 proposed rule to establish a distinct population segment.

There, the FWS noted the following with respect to recovery criteria:

The Service's current recovery goal for the NRM gray wolf population is: Thirty or more breeding pairs (an adult male and an adult female that raise at least 2 pups until December 31) comprising 300+ wolves in a metapopulation (a population that exists as partially isolated sets of subpopulations) with genetic exchange between subpopulations (USFWS 1994; Fritts and Carbyn 1995). Step-down recovery targets require Montana, Idaho, and Wyoming to each maintain at least 10 breeding pairs and 100 wolves by managing for a safety margin of 15 breeding pairs and 150 wolves in mid-winter.  The NRM wolf population met the numeric recovery goal of at least 30 breeding pairs and at least 300 wolves in mid-winter for the first time in 2000. By the end of 2008, the NRM wolf population will have surpassed the numerical recovery goal for 9 consecutive years.

As stated above, the current recovery goal also notes the goal of a metapopulation with genetic exchange between subpopulations. In its discussion of this issue, our 1994 environmental impact statement (Service 1994, appendix 9) said a recovered NRM wolf population would be composed of three parts or subpopulations (Yellowstone, central Idaho, and northwestern Montana), which in combination would be called a metapopulation.   Such a metapopulation structure would depend on wolves from a healthy subpopulation to rekindle a neighboring subpopulation should it experience disruptions from stochastic events like fire, disease, human-caused mortality, or reduced genetic viability (Service 1994, appendix 9).  The 1994 environmental impact statement (Service 1994, appendix 9) stated that the need for ongoing genetic exchange is lessened where the population is large, not completely isolated, and diversity is inherently high due to a large number of genetically diverse founders; all three NRM DPS subpopulations meet this standard.

Currently, genetic diversity throughout the NRM is very high (Forbes and Boyd 1996, p. 1084; Forbes and Boyd 1997, p. 226; vonHoldt et al. 2007, p. 19). Wolves in northwestern Montana and both the reintroduced populations are as genetically diverse as their source populations in Canada; thus, inadequate genetic diversity is not a wolf conservation issue in the NRM at this time (Forbes and Boyd 1997, p. 1089; vonHoldt et al. 2007, p. 19). As a result, there is currently no need for management activities designed to increase genetic diversity anywhere in the NRM DPS.

The July 18, 2008, U.S. District Court for the District of Montana decision cited vonHoldt et al. (2007), which concluded "if the Yellowstone [National Park] wolf population remains relatively constant at 170 individuals (estimated to be Yellowstone [National Park's] carrying capacity), the population will demonstrate substantial inbreeding effects within 60 years," resulting in an "increase in juvenile mortality from an average of 23 to 40%, an effect equivalent to losing an additional pup in each litter." The court also cited previous Service statements that call for "genetic exchange" among recovery areas. The court further stated that dispersal of wolves between the Greater Yellowstone Area and the northwestern Montana and central Idaho core recovery areas was "a precondition to genetic exchange." The preliminary injunction order cited our 1994 environmental impact statement (Service 1994) and vonHoldt et al. (2007) to support its conclusion.

We question many of the assumptions that underpin the vonHoldt et al. (2007) study's conclusions. First, while the study found no evidence of genetic exchange into Yellowstone National Park (8,987 km[FN2] [sic] (3,472 mi[FN2] [sic])), the Park is only a small portion of the Greater Yellowstone Area (63,700 km[FN2][sic] (24,600 mi[FN2]) [sic]). Further limiting the study's ability to detect genetic exchange among subpopulations is the fact that most wolves that disperse to the Greater Yellowstone Area tend to avoid areas with existing resident packs or areas with high wolf densities, such as Yellowstone National Park. Moreover, even among the Yellowstone National Park wolves the study was limited

to a subsample of Park wolves from 1995-2004 (i.e., the radio collared wolves). It is important to consider that our ability to detect genetic exchange within the NRM population is further limited by the genetic similarity of the NRM subpopulations. Specifically, because both the central Idaho and Greater Yellowstone Area subpopulations originate from a common source, only first generation offspring of a dispersing wolf can be detected. Additional genetic analysis of wolves from throughout the NRM population, including a larger portion of the Greater Yellowstone Area than just Yellowstone National Park, is ongoing.

Second, the vonHoldt et al. (2007) prediction of eventual inbreeding in Yellowstone National Park relies upon several unrealistic assumptions. One such assumption limited the wolf population analysis to Yellowstone National Park's (8,987 $km^2$ (3,472 $mi^2$)) carrying capacity of 170 wolves, instead of the more than 300 wolves likely to be managed for in the entire Greater Yellowstone Area (63,700 $km^2$ (24,600 $mi^2$)) by Montana, Idaho, and Wyoming. The vonHoldt el al. (2007) predictive model also capped the population at the Yellowstone National Park population's winter low point, rather than at higher springtime levels when pups are born. Springtime levels are sometimes double the winter low.

It is our current professional judgment that even in the highly unlikely event that no new genes enter Yellowstone National Park or the Greater Yellowstone Area in the next 100 years, that wolf population's currently high genetic diversity would be slightly reduced, but not to the point the Greater Yellowstone Area wolf population would be threatened. Review of the scientific literature shows that, throughout the world, truly isolated wolf populations that are far smaller and far less genetically diverse than the Greater Yellowstone Area population have persisted for many decades and even centuries (Fritts and Carbyn 1995, p. 33; Boitani 2003, pp. 322-23, 330-335; Liberg 2005, pp. 5-6, 73 FR 10514, February 27, 2008). Additionally, in mate selection, wolves have a strong tendency to avoid inbreeding by selecting breeders based on genetic difference; the vonHoldt et al. (2007) study proved this

in Yellowstone National Park. Thus, the predictions by the Vortex model used by vonHoldt et al. (2007) were overly pessimistic regarding the potential effect of theoretical future inbreeding, because it ignored the strong outbreeding selection by wolves. Natural wolf mate selection tendencies show that future dispersers into a system experiencing some level of inbreeding would be much more likely to be selected for breeding and have their genes incorporated into the inbred population (Bensch et al., 2006, p. 62; vonHoldt et al., 2007, p. 1; 73 FR 10514, February 27, 2008). Introduction of just one or two new genetic lines can save a severely inbred small wolf population (Vila et al., 2003, p. 9; Liberg et al., 2004; Liberg 2005, pp. 5-6; Mills 2007, pp. 195-196; Frederickson et al., 2007, p. 2365, 73 FR 10514, February 27, 2008).

Multiple approaches may be taken to facilitate genetic exchange between subpopulations, including natural migration or, if necessary, genetic management (moving individual wolves or their genes into the affected population segment). We have never suggested, nor does the recovery goal require, that natural migration is the only approach to address this potential issue (USFWS 1994, appendix 9). Furthermore, detection of such natural genetic exchange is not required by the recovery goal and would not be practical to require in routine monitoring protocols. Therefore, a revised listing determination may review the recovery goal and any inaccurate implication that the recovery goal requires natural connectivity. This review could result in a revision of our recovery goal and a clarification of the appropriate range of options for maintaining or increasing genetic diversity in the NRM wolf population.

In terms of natural migration, the northwestern Montana and central Idaho core recovery areas are well connected to each other, and to wolf populations in Canada, through regular dispersals. These subpopulations have established genetic and demographic linkages. The Greater Yellowstone Area is the most isolated core recovery area within the NRM DPS (Oakleaf et al., 2006, p. 554;

53

vonHoldt et al., 2007, p. 19). Radio telemetry data indicate that about one wolf per year disperses into the Greater Yellowstone Area from the other recovery areas. However, natural connectivity is not and has never been required to achieve our recovery goal.

Human intervention in maintaining recovered populations is necessary for many conservation-reliant species and a well-accepted practice in dealing with population concerns (Scott et al., 2005). The 1994 wolf reintroduction environmental impact statement indicated that intensive genetic management might become necessary if any of the sub-populations developed genetic demographic problems (USFWS 1994). The 1994 wolf reintroduction environmental impact statement went on to say that other wolf programs rely upon such agency-managed genetic exchange and that the approach should not be viewed negatively (USFWS 1994). An example of successful managed genetic exchange in the NRM population was the release of 10 wolf pups/yearlings translocated from northwestern Montana to Yellowstone National Park in the spring of 1997. Future managed genetic exchange could include relocating other wolf age and sex classes, cross-fostering young pups, artificial insemination, or other means of introducing novel wolves or wolf DNA (deoxyribonucleic acid) into a recovery area if it were ever to be needed.

73 Fed. Reg. 623926-01.

The most recent 2008 Wolf Management Plan proposed by the state of Wyoming was promulgated following the Montana district court's decision. FWS rejected Wyoming's proposed plan, prepared in the State's continuing effort to obtain delisting of the wolf in Wyoming. See 74 Fed. Reg. 15123. The Executive Summary for the plan provides that the state of Wyoming will "commit to maintaining at least 15 breeding pairs of wolves Statewide including

the National Parks, John D. Rockefeller Memorial Parkway (Parkway), National

Elk Refuge (NER), and potentially the Wind River Indian Reservation (WRIR).

Of these 15 breeding pairs, 7 breeding pairs will be maintained outside the

National Parks and Parkway. However, the State of Wyoming working with the

USFWS and the National Park Service will assure that Wyoming's wolf

population never drops below 10 breeding pairs and 100 wolves." Document

27-2 at 5. Further, "[w]olves will be managed under dual classification of

trophy game animal and predatory animal. Wolves will be trophy game animals

within the area of northwestern Wyoming identified as the Trophy Game Area

and depicted in Figure 1. They will be classified as predatory animals in the

remainder of the State. The department will be responsible for monitoring

wolves Statewide regardless of classification." Id.

Among the pertinent Wyoming statutes relevant in this case is Wyo. Stat.

§ 23-101, "Definitions of wildlife" which provides in part:

(viii) "Predatory animal" means:

> (A) Coyote, jackrabbit, porcupine, raccoon, red fox,
> skunk or stray cat; and

> (B) Until the date gray wolves are removed from the
> list of experimental nonessential population,
> endangered species or threatened species in Wyoming
> as provided by W.S. 23-1-108, "predatory animal"

55

includes wolves. After that date, "predatory animal" shall include any gray wolf not within an area of the state in which the gray wolf is:

> (I) Designated as a trophy game animal under subdivision (xii)(B)(I) of this subsection;
>
> (II) Classified as a trophy game animal by the commission pursuant to W.S. 23-1-304(a).

* * * *

(xii) "Trophy game animal" means:

(A) Black bear, grizzly bear or mountain lion; and

(B) From and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108:

(I) "Trophy game animal" shall include any gray wolf within those tracts of land within the following described area, subject to modification as authorized in this subdivision: northwest Wyoming beginning at the east boundary of the Shoshone National Forest and the Wyoming-Montana state line; southerly along said forest boundary to the common boundary between the Shoshone National Forest and the Wind River Indian Reservation; westerly and then southeasterly along the Shoshone National Forest boundary to the Union Pass Road (USFS Road 263); southerly along said road until it intersects the north boundary of the Upper Green River Cattle Association's grazing allotment on forest service lands; following the eastern boundary of said allotment southerly and westerly to the point it

intersects the Bridger-Teton National Forest boundary; westerly along said forest boundary to U.S. Highway 189-191; northwesterly along said highway to U.S. Highway 26-89-191 at Hoback Junction; northerly along said highway to Wyoming Highway 22; westerly along said highway to the Wyoming-Idaho state line; north along said state line to the Wyoming-Montana state line; north and then east along said state line to the east boundary of the Shoshone National Forest. This described area may be diminished by rule of the commission if the commission determines the diminution does not impede the delisting of gray wolves and will facilitate Wyoming's management of wolves; and

(II) "Trophy game animal" shall include any gray wolf within any area of the state where gray wolves are classified as trophy game animals by the commission pursuant to W.S. 23-1-304(a).

Wyoming Statute § 23-1-304, "Classification of gray wolves" provides:

(a) The commission shall by rule and regulation establish areas within the state where gray wolves are classified as trophy game animals and set seasons and bag limits within those areas. The areas designated, seasons and bag limits shall be set annually in a manner the commission determines, through rule and regulation, only as necessary to reasonably ensure at least seven (7) breeding pairs of gray wolves are located in this state and primarily outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway at the end of the current calendar year.

(b) Repealed by Laws 2007, ch. 168, § 5.

(c) For purposes of this section "breeding pair" means an adult male and an adult female gray wolf raising at least two (2)

pups of the year until December 31. The number of breeding pairs shall be certified by the department prior to January 31 of each year.

(d) The department shall institute and maintain an active program of population monitoring statewide. Population monitoring shall include the use of global positioning systems and radio collaring of gray wolves, including use of aerial tracking, necessary to accurately determine the population and movement of gray wolves in the state. The commission is authorized to enter into memoranda of understanding with the United States fish and wildlife service or other federal agencies to fund the purchase of the necessary technology and to ensure accurate and adequate monitoring of wolf population levels and movements through global positioning systems and radio collar tracking. In all areas of the state, except where otherwise provided, any person who harvests a wolf shall notify the department where the harvest occurred within ten (10) days. Any information regarding the number or nature of wolves legally harvested within the state of Wyoming shall only be released in its aggregate form and no information of a private or confidential nature shall be released without the written consent of the person to whom the information may refer. Information identifying any person legally harvesting a wolf within this state is solely for the use of the department or appropriate law enforcement offices and is not a public record for purposes of W.S. 16-4-201 through 16-4-205.

(e) The department shall actively monitor big game animal herd populations statewide to determine whether and to what extent the gray wolf is negatively impacting big game animal herds, and thereby hunting opportunities. To the extent permitted by this title, and notwithstanding other provisions of this title by those means authorized by the commission, the department shall manage the gray wolf population as necessary to ensure the long-term health and viability of any big game animal herd that is being threatened in this state.

(f) This section shall apply from and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108.

(g) The commission is authorized, through rule and regulation, to use aggressive management techniques including the use of aerial hunting and hazing by the department and issuance of permits to private landowners to take wolves to protect private property including, but not limited to, livestock and other domesticated animals from wolf depredation.

(h) Within forty-eight (48) hours of receiving notification from a landowner or his designee that any gray wolf in the state has harassed, injured, maimed or killed livestock or any domesticated animal, the department shall respond. The department may use the aggressive management techniques authorized under subsection (g) of this section or any other management methods necessary, to minimize the harassing, injuring, maiming or killing of livestock and other domesticated animals.

(j) At any time that there exists the number of breeding pairs of gray wolves specified in subsection (a) of this section, the department is authorized to take any action necessary to protect big and trophy game populations in this state from predation by gray wolves. The department shall give priority to areas where the wild ungulate herd is experiencing unacceptable impacts from wolf predation.

(k) The commission is authorized to enter into memoranda of understanding with any federal agency or other state's wildlife agency to carry out any provision of this section and Wyoming's wolf management plan, including the use of aerial hunting.

(m) The commission shall promulgate rules and regulations requiring lethal control of wolves harassing, injuring, maiming or killing livestock or other domesticated animals and for wolves

occupying geographic areas where chronic wolf predation occurs. The rules and regulations shall provide that nonlethal control actions will be used if lethal control could cause relisting of wolves under the endangered species act or if requested by the livestock or domesticated animal owner or agent.

(n) The commission shall promulgate rules and regulations providing for issuance of annual permits to landowners or livestock owners for removing wolves which are harassing, injuring, maiming or killing livestock or other domesticated animals and for wolves occupying geographic areas where chronic wolf predation occurs. The permits shall be issued as long as there are seven (7) breeding pairs within the state and outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway. The rules shall provide for suspending or cancelling permits if further lethal control could cause relisting of wolves under the endangered species act.

(o) The commission shall promulgate rules and regulations establishing a fair compensation program to compensate for wolf predation on livestock as provided in W.S. 23-1-901.

* * * *

Wyoming Statutes § 23-3-115 provides:

(a) Any black bear, mountain lion, bobcat, weasel, badger, gray, red and fox squirrels or muskrat doing damage to private property may be immediately taken and killed by the owner of the property, employee of the owner or lessee of the property.

(b) The owner, employee or lessee shall immediately notify the nearest game warden of the killing of black bear, bobcat or mountain lion. The owner, employee or lessee shall save and care for the skin and procure a Wyoming game tag for the skin of black bear, mountain lion or bobcat.

(c) The provisions of subsection (a) of this section relating to the taking of animals doing damage to private property shall apply to gray wolves from and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23-1-108. The owner, employee or lessee acting under authority of this section shall notify the department of the killing of a gray wolf within an area of the state in which the gray wolf is classified as a trophy game animal. The notification shall be made within ten (10) days of the kill unless the gray wolf was taken in an area where wolves have been classified as trophy game animals pursuant to W.S. 23-1-304(a) in which case the notification shall be made within seventy-two (72) hours.

Pursuant to applicable Wyoming statutes, the Wyoming Game and Fish

Commission promulgated regulations, designated as "Chapter 21, Gray Wolves

Designated as Trophy Game Animals." Section 3(j) defines "Wolf Trophy Game

Management Area" (WTGMA) to mean:

. . . all land where gray wolves shall be considered trophy game animals described as northwest Wyoming beginning at the junction of Wyoming Highway 120 and the Wyoming-Montana stateline; southerly along said highway to the Greybull River; southwesterly up said river to the Wood River; southwesterly up said river to the Shoshone National Forest boundary; southerly along said boundary to the Wind River Indian Reservation boundary; westerly, then southerly along said boundary to the Continental Divide; southeasterly along said divide to the Middle Fork of Boulder Creek; westerly down said creek to Boulder Creek; westerly down said creek to the Bridger-Teton National Forest boundary; northwesterly along said boundary to its intersection with U.S. Highway 189-191; northwesterly along said highway to the intersection with U.S. Highway 26-89-191; northerly along said highway to Wyoming Highway 22 in the town of Jackson; westerly along said highway to

the Wyoming-Idaho state line; north along said state line to the Wyoming-Montana state line; north, then east along said state line to Wyoming Highway 120.

Section 4. Gray Wolves Designated as Trophy Game Animals. Gray wolves found in that portion of Wyoming described as the WTGMA are hereby designated as trophy game animals and managed under the authority of the Wyoming Game and Fish Commission.

(a) The Commission shall manage for at least fifteen (15) breeding pairs (comprising of at least 150 gray wolves) within the WTGMA, with at least seven (7) of those breeding pairs in the WTGMA located primarily outside of the National Parks.

(b) If the Commission determines that there are less than eight (8) breeding pairs located inside of the National Parks for two (2) consecutive years, then the Department shall manage for a sufficient number of breeding pairs and wolves in the area of the WTGMA located outside of the National Parks to achieve the management objectives described in Section 4(a).

(c) The Commission shall not diminish the area of the WTGMA as defined in Section 3(j) unless, based upon the best scientific data and information available, the Commission determines that diminishing the area for the WTGMA will not prevent the Commission from achieving the management objectives described in Section 4(a).

Section 5. Gray Wolves Designated as Predatory Animals. Gray wolves in Wyoming, excluding gray wolves located inside the WTGMA as set forth in this regulation, are hereby designated as predatory animals. Gray wolves taken within the area where gray wolves are classified as predatory animals shall be reported by the person taking any gray wolf to a district game warden, district

wildlife biologist or Department personnel at a Game and Fish Regional Office within ten (10) days of take. The person taking a gray wolf shall provide the sex, the location of the site of kill (identified by the section, township, range or UTM coordinates), the name and address of the person taking the gray wolf, and date of kill.

Collectively, these statutes and regulations provide the basic framework for implementing Wyoming's wolf management plan. 74 Fed. Reg. at 15170.

The Fish and Wildlife Service, as has been discussed in this opinion, has promulgated many Rules regarding the NRM wolf. Now at issue is the 2009 Final Rule, refusing to delist the gray wolf in Wyoming and finding that the state of Wyoming's proposed Wolf Management Plan does not provide adequate regulatory mechanisms to assure the maintenance of a recovered wolf population in the State of Wyoming. In its brief, the agency asserts in making this decision, it did consider numerous factors allowing it to conclude that the proposed regulation of gray wolves in Wyoming is not likely to maintain a recovered wolf population in Wyoming or adequately provide for demographic and genetic connectivity with the Idaho and Montana populations.

The primary issues of concern to the FWS are designation of wolves as a predator outside of the proposed trophy game area, the size of the trophy game area and the potential for reduction of the size of that area at a later date

63

following delisting and the number of breeding pairs to be maintained outside

of the National Parks as affected by the state's provisions for aggressive control

of wolves, including lethal control, and how this affects genetic dispersal and

connectivity in the GYA.  The government also asserts that the effect of state

law requiring aggressive control cannot be relaxed until the wolf population

drops below seven breeding pairs.

In the 2009 Final Rule, at 74 Fed. Reg. 15141, the agency addressed

comments related to the recovery objective of having genetic exchange

between subpopulations, the isolation of the GYA recovery area, and a

perceived failure to meet the recovery goal because of the lack of successful

migrants into the GYA.  It responded:

> Currently, genetic diversity throughout the NRM DPS is very
> high (Forbes and Boyd 1996, p. 10845; Forbes and Boyd 1997, p.
> 226; vonHoldt et al. 2007, p. 19; vonHoldt et al. 2008).  Wolves in
> northwestern Montana and both the reintroduced populations are
> as genetically diverse as their vast, secure, healthy, contiguous,
> and connected source populations in Canada; thus, inadequate
> genetic diversity is not a wolf conservation issue in the NRM at this
> time (Forbes and Boyd 1997, p. 1089; vonHoldt et al. 2007, p. 19).
> This genetic health is the result of deliberate management actions
> by the Service and its cooperators since 1995.  It is misleading to
> compare the large, connected, and genetically robust NRM wolf
> population to very small, very inbred and very isolated wolf
> populations in order to forecast theoretical problems the NRM
> population may have with genetic diversity, let alone to an extent
> that could threaten the viability of the NRM wolf population.  Dr.

L.D. Mech, the world's foremost authority on wolves, responded to our inquiry about ways we might guarantee to ensure the further genetic health of the NRM wolf population (Fuller *et al.* 2003, p. 189-190; Groen *et al.* 2008) as "I consider this a nonissue." Genetic issues are discussed further in Factor E below.

We agree that a portion of the Service's recovery goal calls for "genetic exchange between subpopulations" (see Recovery section above). Genetic exchange was also a major focus of the July 18, 2008, District Court preliminary injunction order. The Recovery section of this rule now clarifies the Service's recovery goal including the genetic exchange portion of it, to correct any misunderstandings or alternative interpretations of what constitutes biological wolf recovery in the NRM. This section provides wording from past documents to demonstrate that the Service recovery goal was never dependent on natural connectivity or prove multi-generation genetic exchange within any recovery segment. Instead, the primary purpose of this portion of the recovery goal was to ensure that no recovery area was totally isolated. The 1994 EIS (Service 1994, p. 6-7) defined a "Recovered wolf population" as "10 breeding pairs of wolves in each of 3 areas for 3 successive years with some level of movement between areas." Natural dispersal and successful reproduction of radio-collared wolves has been documented between all three subpopulation[s].

\* \* \*   In addition, the purpose of the Act is not to maximize genetic diversity or to quibble about genetic theory or the results of theoretical models and their assumptions. The Act is intended to prevent species from becoming extinct and clearly the NRM wolf population will never be threatened by low genetic diversity, genetic drift, or inbreeding. See Factor E for a detailed discussion of this issue.

\* \* \* \*

We believe Wyoming must institute additional protections to facilitate natural genetic exchange. Specifically, the State's

65

regulatory framework should minimize take of non-problem wolves in all suitable habitat and across all of Wyoming's potential migration routes among NRM subpopulations. Statewide trophy game status will assist in this regard as migrating wolves use the current predator area. This measure is particularly important during peak dispersal, breeding, and pup rearing periods. In addition to requiring that Wyoming manage for at least 15 breeding pairs and at least 150 wolves in mid-winter in their State, Wyoming must also manage for at least 7 breeding pairs and at least 70 wolves in Wyoming outside the National Parks. Such requirements are necessary to provide adequate buffers to prevent the population from falling below recovery levels. This secondary goal will provide dispersing wolves more social openings and protection from excessive human-caused mortality. This will also maintain a sufficiently large number of wolves in the GYA; larger population size is a proven remedy to genetic inbreeding. Until Wyoming develops adequate regulatory mechanisms, continued Federal management of the Wyoming wolf population will maximize potential for genetic exchange.

74 Fed. Reg. at 15141-15142.

In response to comments about the adequacy of Wyoming's proposed

regulatory framework the agency offered the following response, stating in

part:

The best scientific and commercial data available demonstrates that the wolf population remains in need of the Act's protections in the Wyoming portion of the range because of inadequate regulatory mechanisms. The 2008 revisions in the Wyoming wolf management plan and emergency regulations (Chapter 21) are greatly improved over earlier versions, however they are still dependent on Wyoming statute and at times appear to promise actions that Wyoming statute prohibits. For example, the Wyoming plan clearly commits to managing genetic

connectivity, but State law allows no regulation of wolf mortality over 88 percent of the State, including many areas likely to be used by dispersing wolves. While we still believe most breeding pairs will remain inside of the boundary of the current trophy game area, the extent of the predatory animal area certainly limits most opportunity for genetic and demographic connectivity, a condition that will assist in sustaining wolf recovery in the GYA. We also believe our 2004 rejection of Wyoming's 2003 wolf management plan was correct (see 71 FR 43410, August 1, 2006). We also determined that in hindsight, we were probably too optimistic about what the law really committed Wyoming to and what could be accomplished by regulations alone. We also should have evaluated the potential for genetic connectivity more closely, when we determined the 2007 plan was sufficient. The very specific and deliberate intent, tone, and wording of Wyoming law clearly continues to be the major impediment to Wyoming developing and implementing a wolf management plan the Service can approve. In the past Wyoming has, with the exception of the professional recommendations they used to establish the proposed 2008 hunting season, almost without exception encouraged wolf take to drive the wolf population down to minimum recovery levels. We believe that the best way for Wyoming to provide adequate regulatory mechanisms would be to develop a statewide trophy game management designation as the basis for any revised regulatory framework. At a minimum, this change would require a revision of Wyoming's wolf management law as the current law establishes the limits of the trophy game area to only 12 percent of the State. Until Wyoming revises their statutes, management plan, and associated regulations, and is again Service approved, wolves in Wyoming shall remain protected by Act. See discussion in Factor D.

74 Fed. Reg. at 15149.

The Final Rule responds to certain comments at 74 Fed. Reg. 15149 in

addressing the requirement for a statewide trophy game status:

67

However, the 12 percent of Wyoming with trophy game protections can be reduced by WGFC. Statewide trophy game status: Will allow Wyoming Game and Fish Department (WGFD) more flexibility to devise a management strategy, including regulated harvest, that provides for self-sustaining populations above recovery goals; prevents a patchwork of different management statuses; will be easier for the public to understand and, thus, will be easier to regulate; is similar to State management of other resources like mountain lions and black-bears; and is consistent with the current regulatory scheme in that the entire State is currently nonessential, experimental. Furthermore, maintenance of the Act's protections Statewide will assist Service Law Enforcement efforts that might otherwise be difficult if predatory animal status was allowed in portions of Wyoming. Finally, retaining the Act's protections in all of Wyoming is biologically warranted because: Wolf dispersal capabilities allow them a range that encompasses the entire state; and retention of the Act's protections in only the current trophy game area would substantially limit potential genetic connectivity. This does not mean Wyoming must manage for wolf pack occupancy everywhere in Wyoming in the future as long as their management framework safely supports their share of a recovered wolf population and allows for adequate genetic and demographic connectivity into the future and incorporates normal wildlife population fluctuations, such as those that appear to have occurred in YNP in 2008. Preliminary counts suggest the YNP segment of the wolf population may be 124 wolves in 12 packs with only 6 breeding pairs. However, the overall GYA population will be similar to 2007, indicating the importance of wolves in Wyoming outside YNP to maintaining wolf recovery in the GYA.

Thus, this final rule removes the Act's protections through the NRM DPS except for Wyoming. Wolves in all of Wyoming will continue to be regulated as a non-essential, experimental population per 50 CFR 17.84(i) and (n). We considered removing the Act's protection in those few often fragmented parts of Wyoming with adequate regulations, such as Wind River Tribal lands, National Parks and Refuges, but to ensure consistent

enforcement of the Act, the potential wolf dispersal throughout Wyoming, and other reasons we did not.   The adequacy of Wyoming's regulatory mechanisms is discussed further under Factor D below.

74 Fed. Reg. at 15149-15150.  Other responses by the FWS state:

After careful consideration, we now believe that the boundaries of the significant portion of the range in Wyoming should be expanded to include the entire State.   Retaining the Act's protections Statewide: Encloses and defines the area where threats are sufficient to result in a determination that a portion of a DPS' range is significant, and is endangered or threatened; clearly defines the portion of the range that is specified as threatened or endangered; and does not circumscribe the current distribution of the species so tightly that opportunities to maintain recovery are foreclosed. Man-made boundaries are appropriate because of these boundaries correspond to differences in threat management; these differences in threat management result in biological differences in status. There also are a practical considerations [sic] (e.g., law enforcement) supporting use of the State line to delineate the significant portion of range where the Act's protections are still necessary.   Retention of the Act's protections throughout the GYA, including those portions in Idaho and Montana, is not necessary given the adequacy of regulatory mechanisms in those States. These issues are discussed further in the Conclusion of the 5-Factor Analysis Section below.

74 Fed. Reg. at 15153-15154.

The agency discusses the adequacy of existing regulatory mechanisms

beginning at 74 Fed. Reg. 15166.  On 15167, the Service notes:

Several issues were key to our approval of State plans including: Consistency between State laws, management plans, and regulations; regulations that prevent excessive take; methods

69

used to measure wolf population status; the organizational ability and skill to successfully monitor and manage State wolf populations; and commitments to manage wolves safely above minimum recovery levels. Our determination of the adequacy of those three key State management plans was based on the combination of Service knowledge of State law, the State management plans, wolf biology, our experience managing wolves for the last 20 years, the success of wolf management in other areas of the world[,] peer review of the State plans, the State response to peer review, and public comments including those from the States.

Wyoming's plan is specifically addressed at length at 74 Fed. Reg. 15170-

15172.    The agency stated that Wyoming's regulatory framework was reanalyzed following the Montana district court's preliminary injunction, where concern was expressed that Wyoming failed to commit to managing for at least 15 breeding pairs; that accepting a small trophy game area designation (approximately 12 percent of northwest Wyoming) was not supported by the record; and that the malleable nature of the trophy game area could be diminished by the WGFC after delisting.  Concerns had also been raised with the depredation control law being more expansive than existing experimental population regulations.  The Service noted that in the predatory area, wolves will experience unregulated human-caused mortality and that wolf behavior and reproductive biology results in wolves being extirpated in the face of extensive human-caused mortality.  It persisted in its conclusions that wolves are unlikely

to survive in portions of Wyoming where they are regulated as predatory

animals. The various proposals for Wyoming regulations were reviewed at

length. The emergency regulations issued October 27, 2008 and revised wolf

management plan were reviewed.

> . . . While we believe the revised regulatory framework is a vast improvement over its predecessor, the emergency regulation is temporary (it is only in effect for 120 days). Thus, we can not rely on it as an adequate regulatory mechanism. Most importantly, these regulatory improvements do not address the legislative shortcomings noted above (i.e., a trophy game area that can be diminished and a statute that encourages the WGFC to manage the population toward the minimum recovery goals in a manner that allows the possible reduction of the wolf population to below recovery levels.
>
> We find that a regulatory framework for wolf management at minimum recovery levels is not adequate. Attempts to maintain any wildlife population at bare minimum levels are unlikely to be successful. As with all wildlife species, periodic disturbance or random events will occur. This fact was proven by the dramatic, but temporary changes, in wolves and breeding pairs in YNP in 2005 and 2008. Managing at minimal levels increases the likelihood that periodic disturbance or random events will leave the population below management objectives. Instead, the State wildlife agency should be given leeway in its management approach to compensate for periodic or random events, as Montana and Idaho have done. Managing to minimal recovery also increases the chances of genetic problems developing in the GYA population and would reduce the opportunities for demographic and genetic exchange in the WY portion to the GYA.
>
> We also reviewed Wyoming's proposed 2008 hunting season regulation. While the proposed 2008 hunting season was not

71

implemented, we determined it was well designed, biologically sound, and, by itself, it would not have threatened Wyoming's share of the recovered NRM wolf population. Wyoming's hunting season was designed around an allowable hunter-caused mortality in each of the four hunting districts in the trophy game area. Hunting would end by November 30, or in each subquota as its individual quota is filled, or when 25 wolves had been harvested, whichever is sooner. This level of hunter-caused mortality would remove a small portion of the wolves in Wyoming outside the national parks. If other sources of mortality had been adequately regulated, this level of hunter harvest would likely have resulted in a Wyoming wolf population outside the national parks of just under 200 wolves by December 31, 2008 and nearly 400 wolves in the GYA. Because hunting harvest would end November 30, it would have had only minor negative impacts within the trophy game area on naturally dispersing wolves or the opportunity for effective genetic migrants into Wyoming. Wolves in YNP would not be substantially affected by a regulated public hunt, as hunting is not allowed in national parks and wolves rarely leave YNP during the time period when the fall hunting season would occur.

Considering all of the above, we now determine that Wyoming's regulatory framework does not provide the adequate regulatory mechanisms to assure that Wyoming's share of a recovered NRM wolf population would be conserved if the protections of the Act were removed (Gould 2009). Until Wyoming revises their statutes, management plan, and associated regulations, and is approved by the Service, wolves in Wyoming remain listed as experimental population in this portion of the NRM DPS. Specific required revisions are discussed in the Conclusion of the 5-Factor Analysis section of the rule below.

74 Fed. Reg. at 15171-15172.

In the conclusion of the 5 factor analysis, the agency determined:

As described in more detail in Factor D and below, Wyoming's

regulatory framework does not provide the adequate regulatory mechanisms to assure that Wyoming's share of a recovered NRM wolf population would be conserved if the protections of the Act were removed. In order to constitute adequate regulatory mechanisms, Wyoming's regulatory framework needs to: Designate and manage wolves as a trophy game species statewide; manage for at least 15 breeding pairs and at least 150 wolves in mid-winter in their State and at least 7 breeding pairs and at least 70 wolves in mid-winter outside the National Parks; authorize defense of property take in a manner that is similar to the current regulatory scheme; consider all sources of mortality, including all hunting and defense of property mortality, in its total statewide allowable mortality levels; and manage the population to maintain high levels of genetic diversity and to continue ongoing genetic exchange. Until Wyoming revises their statutes, management plan, and associated regulations, and is again Service approved, wolves in Wyoming continue to require the protections of the Act.

74 Fed. Reg. 15179.

At 74 Fed. Reg. 15181, the Service stated that it considered Wyoming to

be critical to the establishment and maintenance of the NRM wolf population.

It considered all of Wyoming with a focus on northwest Wyoming which

contains the vast majority of the State's suitable wolf habitat in determining

whether the wolf is threatened or endangered throughout all or a significant

portion of its range. It again determined that Wyoming's regulatory framework

does not provide adequate regulatory mechanisms to ensure that Wyoming's

share of a recovered NRM wolf population would be conserved if the protections

of the Act were removed.

73

Northwest Wyoming meaningfully affects resiliency in that it contains a high percentage of the NRM DPS' large blocks of high quality habitat thereby contributing to the NRM DPS' long-term viability. Similarly, northwest Wyoming contains a population that is essential to the conservation of the NRM population. We view this portion of the NRM population as sufficiently robust to make a high contribution to the ability of the NRM DPS to recover from periodic disturbance. Northwest Wyoming's National Parks also serve as a refugium protected from certain population events (such as human caused mortality). Northwest Wyoming also contains suitable habitat areas which provide all of the species' life history functions. Collectively, this information indicates that northwest Wyoming would allow the NRM DPS to recover from periodic disturbance and, thus, meaningfully contribute to the resiliency of the NRM DPS.

In terms of redundancy, we considered several factors. First, Wyoming includes approximately 25 percent of the total gross area of the NRM DPS. Second, northwest Wyoming includes approximately 25 percent of the NRM DPS' current population and a third of the minimum population recovery goal. Northwest Wyoming also includes approximately 17 percent of the NRM DPS' total suitable habitat. Finally, northwest Wyoming contains the majority and the core of the Yellowstone recovery area, one of three subpopulations in the NRM DPS. Collectively, this information indicates that northwest Wyoming provides a margin of safety for the species to withstand catastrophic events and, thus, meaningfully contributes to the redundancy of the NRM DPS.

In terms of representation, suitable habitat within northwest Wyoming's National Parks and some surrounding areas contain ecological settings that differ from the ecological setting of most of the rest of NRM DPS. This ecological setting results in some unique or unusual behavior. For example, the presence of bison in these areas result in the unique, learned, group hunting behavior not required for other prey types. Other studies found that similar local adaptations to specific prey type resulted in genetic differences

74

(Leonard *et al.* 2005). Collectively, this information indicates that northwest Wyoming's National Parks and some surrounding areas could play a role in conserving the species' adaptive capabilities and, thus, contributes to the representation of the NRM DPS.

We have determined that northwest Wyoming meaningfully contributes to NRM DPS' resiliency, redundancy, and representation at a level such that its loss would result in a decrease in the ability to conserve the NRM DPS. Thus, this portion of the range constitutes a significant portion of the NRM DPS's range as described in the act.

Id., 74 Fed. Reg. at 15181-15182.

Then, once a portion of the range was identified as significant, the

determination as to whether in fact the species in threatened or endangered in

this significant portion of its range was considered.

Within this portion of the range, managing human-caused mortality remains the primary challenge to maintaining a recovered wolf population in the foreseeable future. If Wyoming's wolf population is managed above recovery levels, the species' biology (specifically its reproductive capacity) and the availability of a large secure block of suitable habitat will maintain a strong source population capable of withstanding all other foreseeable threats. Unfortunately, Wyoming's current regulatory framework does not provide the adequate regulatory mechanisms to assure that Wyoming's share of a recovered NRM wolf population would be conserved if the protections of the Act were removed.

Id. After noting that the Montana district court's order was concerned with a

lack of evidence of genetic exchange between populations, in response the

agency stated:

> We believe Wyoming current regulatory framework for delisted
> wolves would further reduce the likelihood of natural genetic
> connectivity as wolves are unlike to successfully traverse the 88
> percent of Wyoming where wolves are considered predatory
> animals.
>
> The court also stated that we acted arbitrarily and
> capriciously when we approved Wyoming's 2007 statute which
> allows the WGFC to diminish the trophy game area (which State
> law restricts to no more than 12 percent of Wyoming) if it
> "determines the diminution does not impede the delisting of gray
> wolves and will facilitate Wyoming's management of wolves."
> Because wolves are unlikely to survive where they are classified as
> predatory animals, potential expansion of the predatory animal
> would further limit occupancy in Wyoming and opportunities for
> natural connectivity.

Id. In reaching the determination that all of Wyoming should be managed as

a trophy game area, the agency concluded that wolves are unlikely to survive

where they are classified as predatory animals.   It found the Wyoming

regulatory framework to limit natural genetic connectivity and that wolf

dispersal patterns indicate that dispersing wolves moving into the GYA from

Idaho or Montana are likely to move through the predatory area (Boyd et al.

1995).  Physical barriers, limited social openings and the Wyoming winter elk

feeding grounds may direct wolves into the predatory area.

> Thus, we believe dispersal is more likely to lead to genetic
> exchange if dispersers have safe passage through the predatory
> area.  While natural connectivity is not and has never been required
> to achieve our recovery goal, we believe it should be encouraged

76

so as to minimize the need for agency-managed genetic exchange. Because exact migratory corridors are not known, WGFD should be given regulatory authority over the entire State to adaptively manage this issue as new information comes to light over time.

A statewide trophy game area is also advisable given the dispersal capabilities of wolves. . . . Some of these wolves may disperse and return to the core of suitable habitat. A statewide trophy game status will allow for routine and unusual dispersal events without near certain mortality (although pack establishment in areas of unsuitable habitat is extremely unlikely).

Furthermore, statewide trophy game status will allow more flexibility to devise a management strategy, including regulated harvest that provides for self-sustaining populations above recovery goals. For example, having management authority over the entire State could allow for strategic use of all suitable habitat if necessary during years of disease outbreak. Such an approach could also allow managers to strategically shift wolf distribution and densities in response to localized impacts to native ungulate herds and livestock.

Additionally, we believe statewide trophy game status prevents a patchwork of different management statuses; will be easier for the public to understand and, thus, will be easier to regulate; is similar to State management of other resources like mountain lions and black bears; and is consistent with the current regulatory scheme in that the entire State is currently nonessential, experimental. Finally, maintenance of the Act's protections Statewide will assist Service law enforcement efforts that might otherwise be difficult if predatory animal status was allowed in portions of Wyoming.

We believe the entire State of Wyoming should be managed as a trophy game area. Continuation of the current regulatory framework in Wyoming would meaningfully affect the DPS's resiliency, redundancy, and representation, and decrease the ability

to conserve the species. For the purposes of this rule, the entire State shall be considered a significant portion of the range with the understanding that different portions of the range contribute different biological benefits. This boundary: Encompasses the area where threats are sufficient to result in a determination that a portion of a DPS' range is significant, and is endangered or threatened; clearly defines the portion of the range that is specified as threatened or endangered; and does not circumscribe the current distribution of the species so tightly that opportunities to maintain recovery are foreclosed. Retaining the Act's protections Statewide also is inclusive of the area where a lack of threat management results in biological differences in status (i.e., it covers the State's entire predatory animal area). By identifying the entire State as a significant portion of the range we are not suggesting wolves could or should reoccupy or establish packs in unsuitable habitat.

Id., 74 Fed. Reg. at 15183.

The agency has determined that the minimum population goals have been met and exceeded, in all three core recovery areas of the NRM DPS. The 2009 Final Rule finds that Wyoming's proposed regulatory framework is not adequate in that it limits natural genetic connectivity, although natural genetic connectivity has not been required at any time to achieve the recovery goal. The desire for natural connectivity is "encouraged so as to minimize the need for agency-managed genetic exchange." It is clear that concerns about dispersal of wolves into the GYA from Idaho or Montana, which may require travel through the predatory area, are considered by FWS to be a threat to

Wyoming's ability to maintain the wolf population above recovery levels. The materials in the administrative record, however, are not entirely consistent with the conclusion that the entire the state of Wyoming must be designated as a trophy game area to accomplish this goal. See, only by way of example, AR 2009-029051 (included in Appendix A to this Order), which identifies recommended areas where wolves remain listed in Wyoming, as well as trophy game area and suitable habitat. Collectively, these areas do not encompass the entire state of Wyoming. This suggests that the proposed area could, at most, encompass that area in which the vast majority of suitable wolf habitat is located in northwest Wyoming. There is no indication that lack of genetic connectivity and diversity would cause the wolf population in the GYA to become threatened in the foreseeable future. All of the materials in the record indicate that genetic connectivity will not likely be reduced in any manner anywhere from 60 to 100 years.

The agency determined in the Final Rule that northwest Wyoming meaningfully contributes to the NRM DPS's resiliency, redundancy, and representation at such a level that its loss would result in a decrease in the ability to conserve the NRM DPS. Northwest Wyoming is that portion of the range constituting a significant portion of the NRM DPS' range as described in

the act. The proposed regulatory framework was perceived by the agency to reduce the likelihood of natural genetic connectivity as wolves would be unlikely to successfully traverse the areas in Wyoming where wolves are considered predatory animals. The state regulatory framework also provides for potential expansion of the predatory area when WGFC determines that diminution will not impede delisting of gray wolves and will facilitate the state's management of wolves. Again, because wolves are unlikely to survive where classified as predators, the agency states that potential expansion of the predatory area further limits occupancy in Wyoming and other opportunities for natural connectivity.

In its regulatory plan, Wyoming has committed to manage for at least 15 breeding pairs and at least 150 wolves in mid-winter to ensure the population never falls below the minimum recovery goal of 10 breeding pairs and 100 wolves per state. At least 7 of those breeding pairs will be located primarily outside of the National Parks, and when the WGFC determines there are less than 8 breeding pairs inside of the National Parks for 2 consecutive years, the department shall manage for a sufficient number of breeding pairs and wolves in the trophy game area, outside of the National Parks, to achieve the 15 breeding pair–150 gray wolves standard. "The State of Wyoming will commit

to manage for at least fifteen (15) breeding pairs consisting of at least 150 wolves within the WTGMA including the National Parks, John D. Rockfeller Memorial Parkway (Parkway), and National Elk Refuge (NER). Of these fifteen (15) breeding pairs, at least seven (7) breeding pairs will be maintained outside the National Parks and Parkway. In the event the Commission determines there are less than eight (8) breeding pairs inside the National Parks for 2 consecutive years, the Department shall take actions to ensure the total number of breeding pairs inside the WTGMA is at least fifteen (15) breeding pairs. The Commission shall not diminish the WTGMA unless, based on the best scientific data and information available, the Commission determines that the diminished area will sustain at least fifteen (15) breeding pairs consisting of at least 150 wolves, with at least seven (7) of those breeding pairs primarily outside of the National Parks." Document 28-11, at 38 of 42, AR 2009-035281, AR 2009-35287.

Wyoming's depredation control laws reviewed in the 2009 Final Rule are considered by FWS as more expansive than existing nonessential, experimental regulations governing takes. Those regulations outline the circumstances when take of gray wolves in an experimental population may be permitted, including defense of property provisions, *inter alia*. See 50 C.F.R. § 17.84(i) and (n).

81

Wyoming's plan and regulations also address regulated take of gray wolves in the trophy game management area and unregulated take of gray wolves in the predatory area.  See Document 26-4; Document 28-11,-12 Wyoming Gray Wolf Management Plan dated November 18, 2008.  It is not entirely clear how Wyoming's defense of property and wolf depredation laws would be analyzed by FWS if the size of the trophy game management area did not include the entire state of Wyoming as is currently proposed in the Wyoming wolf management plan.

The Court offers the following observations.  Given the past history of the wolf project, both the state of Wyoming and the FWS have been facing conflicting rulings and determinations, based on substantially the same scientific and commercial data – a Catch-22 for all.  The courts have done little to facilitate resolution of the issues and an understanding as to what is necessary to satisfy the requirements of the ESA's delisting provisions in the unique facts of this case.  In this confused state of affairs, the Court is required to review the agency decision under Section 706 of the APA and may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  The petitioners/intervenors have argued that a heightened standard of review should apply in that the agency departed

in the 2009 Final Rule from its prior decisions approving the Wyoming wolf

management plan and regulations, without offering any new scientific or

commercial data to support its position.

The United States Supreme Court has addressed this issue in Federal

Communications Commission v. Fox Television Stations, Inc., 129 S.Ct. 1800

(2009). In that opinion the Court stated:

> The Administrative Procedure Act, 5 U.S.C. § 551 et seq., which sets forth the full extent of judicial authority to review executive agency action for procedural correctness, see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 545-549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), permits (insofar as relevant here) the setting aside of agency action that is "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). Under what we have called this "narrow" standard of review, we insist that an agency "examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). We have made clear, however, that "a court is not to substitute its judgment for that of the agency," ibid., and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).
>
> In overturning the Commission's judgment, the Court of Appeals here relied in part on Circuit precedent requiring a more substantial explanation for agency action that changes prior policy. The Second Circuit has interpreted the Administrative Procedure Act and our opinion in State Farm as requiring agencies to make clear "'why the original reasons for adopting the [displaced] rule or

policy are no longer dispositive'" as well as "'why the new rule effectuates the statute as well as or better than the old rule.'" 489 F.3d, at 456-457 (quoting New York Council, Assn. of Civilian Technicians v. FLRA, 757 F.2d 502, 508 (C.A.2 1985); emphasis deleted). The Court of Appeals for the District of Columbia Circuit has similarly indicated that a court's standard of review is "heightened somewhat" when an agency reverses course. NAACP v. FCC, 682 F.2d 993, 998 (1982).

We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review. The Act mentions no such heightened standard. And our opinion in State Farm neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance. That case, which involved the rescission of a prior regulation, said only that such action requires "a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." 463 U.S., at 42, 103 S.Ct. 2856 (emphasis added). [FN2 omitted] Treating failures to act and rescissions of prior action differently for purposes of the standard of review makes good sense, and has basis in the text of the statute, which likewise treats the two separately. It instructs a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold unlawful and set aside agency action, findings, and conclusions found to be [among other things] ... arbitrary [or] capricious," § 706(2)(A). The statute makes no distinction, however, between initial agency action and subsequent agency action undoing or revising that action.

To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. See United States v. Nixon, 418 U.S. 683, 696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). And of

84

course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates. This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must – when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. Smiley v. Citibank (South Dakota), N. A., 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). It would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

Fox Televisions Stations, Inc., 129 S.Ct. at 1810-1811 (footnote 2 omitted).

In this case, the Court finds that the agency has not provided a reasoned explanation for its varying actions during the course of this long term wolf reintroduction project. While the Court does not believe that a heightened standard of review necessarily applies in this case, it still must review the agency action to determine if it is arbitrary, capricious, an abuse of discretion or contrary to law. The Court may not substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. Fox Television Stations, Inc., 129 S.Ct. at

1811.

While the history of the case is complicated, the Court finds that the government's determination that Wyoming must adopt a state-wide trophy game management area is not supported by any new commercial or scientific data showing that a state-wide trophy area ensures Wyoming's share of the recovered NRM wolf population would be conserved in accordance with the requirements of the ESA. The agency cites to no new data suggesting that a statewide trophy game management area is required to facilitate genetic exchange, natural or managed, in the NRM DPS in the foreseeable future. It cites to little data that indicate a dual classification system such as that proposed in this case is not permissible or would preclude compliance with the ESA. The agency determined that Wyoming's regulatory framework maintains the wildlife population at bare minimum levels increases the likelihood that periodic disturbances or random events will cause the population to decline below management objectives, without identifying new commercial or scientific data to support the conclusion.

FWS also suggests that the State wildlife agency should be given leeway in its management approach to compensate for such periodic or random events, and that state management to minimal recovery levels increases the chances

of genetic problems in the GYA population and reduces opportunities for demographic and genetic exchange in the Wyoming portion of the GYA. The language of the 2009 Final Rule states its previous approval of the Wyoming dual classification approach failed to consider impacts of the predatory animal area to genetic connectivity. This determination was made following the Montana district court's preliminary injunction and opinion finding that the agency did not provide a reasoned explanation for its decision to delist despite a lack of evidence of genetic exchange between wolves in the Greater Yellowstone core recovery area and the other two core recovery areas. Document 27-10 at 5.

In the 2007 proposed rule discussion, 72 Fed. Reg. at 6121, the agency stated:

> The recovery plan (Service 1987, p. 13), the metapopulation structure recommended by the 1994 EIS (Service 1994), pp. 6:74-75), and subsequent investigations (Bangs 2002, p.3) recognizes the importance of habitat connectivity between northwestern Montana, central Idaho, and the GYA. There appears to be enough habitat connectivity between northwestern Montana, central Idaho, and the GYA. There appears to be enough habitat connectivity between occupied wolf habitat in Canada, northwestern Montana, Idaho, and (to a lesser extent) the GYA to ensure exchange of sufficient numbers of dispersing wolves to maintain demographic and genetic diversity in the NRM wolf metapopulation (Oakleaf et al. 2006, p. 559; Carroll et al. 2006, p. 32; Wayne 2005; Boyd 2006). To date, from radio-telemetry monitoring, we have

documented routine wolf movement between Canada and
northwestern Montana (Pletscher et al. 1991, p. 544; Boyd and
Pletscher 1999, pp. 1095-1096), occasional wolf movement
between Idaho and Montana, and at least 11 wolves have traveled
into the GYA (Wayne 2005; Boyd et al. 1995, pp. iii-3-1; Boyd
2006). Because we know only about the 30 percent of the wolf
population that has been radio-collared, additional dispersal has
undoubtedly occurred. This documentation demonstrates that
current habitat conditions allow dispersing wolves to occasionally
travel from one recovery area to another. Finally, the Montana
State plan (the key State regarding connectivity) commits to
maintaining natural connectivity to ensure the genetic integrity of
the NRM wolf population by promoting land uses, such as
traditional ranching, that enhance wildlife habitat and conservation.

72 Fed. Reg. at 6121. The data and studies cited and relied upon by the

Service when it crafted the rule seeking to delist the entire NRM DPS in the

2008 Final Rule also indicated that genetic exchange through habitat

connectivity between Montana, central Idaho, and the GYA was sufficient to

ensure exchange of sufficient numbers of dispersing wolves to maintain

demographic and genetic diversity in the NRM wolf metapopulation. In the

record, there are no unequivocal statements by the agency that genetic

exchange or habitat connectivity is not sufficient to ensure that the recovery

goals will be met and sustained or that genetic connectivity will be reduced to

the point that the wolf population in the GYA would be threatened. The Montana

district court determined that the Service had rejected genetic exchange as a

necessary component of recovery criteria. This Court respectfully disagrees and believes that the agency's discussions regarding genetic connectivity in all of the rules promulgated reflect that genetic connectivity has indeed been considered as one of the components of the recovery goals, the contours of which are outlined earlier in the 1987 recovery plan and 1994 FEIS, albeit reaching different conclusions with respect to the various rules relying on substantially the same studies and data.

A common thread throughout all of the rulemaking regarding the wolf recovery plan and the Wyoming wolf management plan is how the size and permanence of the trophy game area identified in the Wyoming wolf management framework will affect genetic connectivity in the GYA. The agency expressed concern that wolves are unlikely to survive in the expansive area in which wolves are classified as predatory animals. Dispersal patterns suggest that dispersing wolves moving into the GYA from Idaho or Montana are likely to move through the predatory area that is presently identified in the state regulatory framework. 74 Fed. Reg. at 15183. Certain factors were more likely to direct dispersal into the predatory area portions of Wyoming, including physical barriers in winter, limited social openings and the attraction of the winter elk feed grounds in the predatory area. "We believe that dispersal is

more likely to lead to genetic exchange if dispersers have safe passage through the predatory area. While natural connectivity is not and has never been required to achieve our recovery goal, we believe it should be encouraged so as to minimize the need for agency-managed genetic exchange." Id. Additionally, the agency stated that the potential expansion of the predatory animal area pursuant to Wyoming's statute could "limit breeding pair occupancy in Wyoming and would reduce the opportunities for successful dispersal and genetic exchange." 74 Fed. Reg. at 15176.

This follows the agency's determination that northwest Wyoming meaningfully contributes to the NRM DPS's resiliency, redundancy, and representation at a level such that its loss would result in a decrease in the ability to conserve the NRM DPS. 74 Fed. Reg. at 15182. "This portion of the range constitutes a significant portion of the NRM DPS' range as described in the act." Id. "Within this portion of the range, managing human-caused mortality remains the primary challenge to maintaining a recovered wolf population in the foreseeable future. If Wyoming's wolf population is managed above recovery levels, the species' biology (specifically its reproductive capacity) and the availability of a large secure block of suitable habitat will maintain a strong source population capable of withstanding all other

90

foreseeable threats." Id. However, the agency then went on to find that the entire state of Wyoming, rather than northwest Wyoming, constituted a significant portion of the range and concluded that the entire state should be managed as a trophy game area. Id., 72 Fed. Reg. at 15183.

The agency seeks to maintain wolf recovery levels at a level in excess of the minimum recovery levels outlined in the 1987 recovery plan and 1994 FEIS. It does not offer reasoned explanations why the entire state of Wyoming must be designated as a trophy game area when more than 70% of suitable wolf habitat is in the GYA and northwest Wyoming. All suitable habitat, with the exception of a few pockets of suitable habitat in other portions of the state, as reflected in AR 2009-029051 by way of example, is in northwestern Wyoming. Boundaries used to define the extent of a significant portion of the range are declared to be boundaries that enclose and define the area where threats are sufficient to result in a determination that a portion of a DPS' range is significant and is endangered or threatened. Boundaries are to clearly define the portion of the range that is specified as threatened or endangered and may consist of geographical or administrative features and should not circumscribe the current distribution of the species so tightly that opportunities for recovery are foreclosed. 74 Fed. Reg. at 15182.

There is no evidence that the state's proposed dual classification of gray wolves precludes maintenance of genetic connectivity (natural or managed) in a significant portion of the gray wolf's range in northwestern Wyoming and the GYA. There is no meaningful scientific explanation provided as to why Wyoming's commitment to manage for 15 breeding pairs and 150 wolves in a trophy game area in the state of Wyoming should be regarded as insufficient to manage above recovery levels, even recognizing that the state has indeed relied on 8 breeding pairs in the National Parks to meet its portion of the recovery goals. Notwithstanding the language in the Final Rule to the contrary, there is no reasoned explanation, supported by the best scientific and commercial data available to the agency,[4] that would lead to the ineluctable conclusion that a trophy game area of a sufficient size and permanence, providing potential migration routes allowing dispersal among the NRM subpopulation and managed within a defined trophy game area constituting less than the entire state of Wyoming, would not allow the state to maintain a recovered wolf population, as defined in the 1987 recovery plan and 1994 FEIS,

---

[4] The government has stated that the peer reviewers did not review Wyoming's current law, its consistency with Wyoming's regulations and plan or FWS's detailed scientific analysis in the 2009 Final Rule. Federal defendant's opening brief, Document 31 at 36.

in the foreseeable future. The agency addresses the dispersal capabilities of wolves, and states that a statewide trophy game area allows more flexibility in devising management strategies "for strategic use of all suitable habitat if necessary during years of disease outbreak" and allows "managers to strategically shift wolf distribution and densities in response to localized impacts to native ungulate herds and livestock," preventing a "patchwork of different management statuses," making it easier to understand by the public, and treating wolves in a manner similar to state management schemes for other resources, and assisting law enforcement that might "otherwise be difficult if predatory animal status was allowed in portions of Wyoming." 74 Fed. Reg. at 15183. These statements, however, do not address with scientific data why the dual classification scheme does not allow for accomplishing the goals of the 1987 recovery plan and 1994 FEIS, when Wyoming has clearly committed to maintain a wolf population in the trophy game area in a manner expressly designed to be sufficient to prevent relisting under the Endangered Species Act.

The agency's discussion of the Wyoming regulatory program disregards the express language of the pertinent state statutes and regulations. Wyoming's current regulatory scheme was crafted in response to and in reliance on the agency's earlier guidance regarding deficiencies in the previously

proposed plan. In it, Wyoming expressly commits in that regulatory scheme to manage for 15 breeding pairs and 150 wolves in the area encompassing the National Parks and the proposed trophy game area. The Wyoming plan also commits to managing wolves in Wyoming's trophy game area so as to prevent relisting of wolves in Wyoming as an endangered or threatened species. The agency's discussions of the Wyoming plan in the 2009 Final Rule do not consider or analyze the state's management plan adequately with respect to the costs and impacts of the Final Rule on the Wyoming Game & Fish, the state agency charged with implementation of the wolf management plan. The 2009 Final Rule, by requiring state-wide management of wolves in the wolf management plan, imposes additional costs of management and additional management and monitoring responsibilities upon the Wyoming Game & Fish without adequate explanation.

It does appear that there is some question as to the size of the trophy game area in northwestern Wyoming that would encourage genetic connectivity and exchange between the three recovery areas and whether there are areas where wolves are treated as predators that might more appropriately be included in the trophy game area. The FWS has suggested a recommended trophy game area where wolves should remain listed in Wyoming in other

94

contexts which does not include the entire state of Wyoming. See e.g., AR 2009-02951; 74 Fed. Reg. at 15126 (copies attached as Appendix A). These documents suggest that a more limited area, less than the entire state of Wyoming, may achieve the purposes of the Endangered Species Act and ensure conservation of the species in the GYA and permit the recovery goals to be met and maintained. The management zones outlined in the 1987 recovery plan recognized that topography is an important factor in maintaining gene flow between recovered populations in the future. However, it also noted that identification of dispersal corridors in Zone III is not expected nor intended to curtail multiple use management. It recognized that Zone III areas contain established human activities such as domestic livestock use or developments in a sufficient degree as to "render wolf presence undesirable" where "maintenance and improvement of habitat for wolves are not management considerations." Document 28-3 at 55, Bates No. 00961. The defined viable wolf population in the NRM exists when "30 breeding pairs of wolves are maintained in three designated recovery areas for a minimum of 3 successive years. A minimum of 10 pairs must be maintained in each of the three recovery areas." Id. The recovery areas include central Idaho, northwestern Montana and the Greater Yellowstone Area. The recovery area does not include

the entire state of Wyoming, although the entire state of Wyoming is included in the DPS, as are the states of Idaho and Montana.

There is no new scientific or commercial data that suggest the state's dual classification of wolves, in and of itself, cannot meet, accomplish, and maintain the identified recovery goals in the GYA, including northwestern Wyoming. The recovery targets required Montana, Idaho and Wyoming to each maintain at least 10 breeding pairs and 100 wolves by managing for a safety margin of 15 breeding pairs and 150 wolves in mid-winter. All of the materials cited indicate that genetic diversity through the NRM is very high and that genetic diversity is not a wolf conservation issue in the NRM and that there is no present need for management activities designed to increase genetic diversity anywhere in the NRM DPS. If necessary, other management actions can address genetic dynamics, in additional to natural migration, including translocation and similar management actions. The size of the trophy game management area must be, according to all scientific data, of a sufficient size to address concerns regarding human caused mortality and allow wolves to persist in numbers sufficient to meet recovery criteria, utilizing scientific expertise and actual data to support the decision. The rulemaking proceedings have relied on substantially the same data and studies (e.g., Oakleaf and vonHoldt, only by way of example). All,

including the vonHoldt study relied on by the Montana district court, have concluded that genetic connectivity, although it could possibly become a concern in the future, is not presently a concern that cannot be adaptively managed to meet and maintain recovery goals, including genetic connectivity throughout the three recovery areas.

The Court also believes that the agency has employed a cramped interpretation of the Wyoming regulatory framework when it asserts the trophy game area will automatically be reduced in size and subject to further diminution if the commission determines it does not impede delisting of gray wolves and will facilitate management of wolves in Wyoming. The framework, while unique to Wyoming, provides for an express commitment to manage for 15 breeding pairs of wolves in the state, and to manage for at least 7 breeding pairs outside of the National Parks, and to ensure that the gray wolf population is not diminished below minimum recovery levels. The plan, while it does require the commission to promulgate rules and regulations requiring lethal control of wolves harassing, injuring, maiming or killing livestock or other domesticated animals and geographic areas where chronic wolf predation occurs, also provides that nonlethal control actions are to be used if lethal control could cause relisting under the Endangered Species Act. Wyo. Stat. §

97

23-1-104.[5]

The zone management scheme in the recovery plan recognized that Zone III areas will contain established human activities such as domestic livestock use or developments in sufficient degree as to render wolf presence undesirable and that maintenance and improvement of habitat for wolves are not management considerations in Zone III. This recognition would seem to militate against the requirement that the state's regulatory framework provide for a statewide trophy game area encompassing areas where there is no suitable wolf habitat, as was required by the agency in the 2009 Final Rule.

The Court finds and concludes that the agency's requirement that the state of Wyoming designate in its wolf management plan the entire state as a trophy game management area, rather than that portion of northwestern Wyoming (including the GYA recovery area) necessary to facilitate movement and ensure dispersal of wolves so as to preserve genetic connectivity and to ensure that self sustaining populations will be maintained above recovery goals, is arbitrary and capricious and should be set aside.

---

[5]This corresponds quite closely to the definitions of "take" in 16 U.S.C. § 1532: "(19) The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." The agency has asserted that the state's wolf management plan is too vague in that it does not define the terms "harass."

The Court further finds and concludes, however, that the matter should be remanded to the agency to revisit and consider issues specifically including but not limited to, whether the proposed size of the trophy game management area in northwestern Wyoming is sufficient to allow the state to meet and maintain recovery goals. Any trophy game management area should ensure that YNP is not totally isolated from the other recovery areas, and also be of such permanence to preserve genetic connectivity in areas likely to be used by gray wolves within the three recovery areas, including northwestern Montana, central Idaho and the GYA. The agency should be given an opportunity to consider these issues first and to determine whether the state's proposed trophy game area outside of the National Parks is sufficient to ensure the protection and conservation of gray wolves in the three recovery areas. It should have the opportunity to consider whether the contours of the trophy game area should be expanded to include additional portions of northwestern Wyoming where wolves are currently treated as predators to accomplish those identified goals. It should have the opportunity to analyze in this context the defense of property and wolf depredation laws in considering whether the management plan is an adequate regulatory mechanism.

Accordingly, it is hereby

**ORDERED** that the decision of the FWS to require designation of the entire state of Wyoming as a trophy game area and refusing to refuse to permit delisting of the gray wolf in Wyoming for that reason is arbitrary and capricious and should be set aside. **It is further**

**ORDERED** that the matter should be remanded to the agency to permit it to determine whether the trophy game area, as proposed in Wyoming's wolf management framework is sufficient to preserve genetic connectivity in northwestern Wyoming and the GYA, whether it satisfies the recovery goals of the 1987 recovery plan and 1994 FEIS, whether the proposed regulatory framework ensures the conservation and protection of gray wolves in an approved trophy game area in northwestern Wyoming as required by the Endangered Species Act, and to analyze in this context the defense of property and wolf depredation laws in considering whether the management plan is an adequate regulatory mechanism.

Dated this ___18th___ day of ___November___ 2010.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| WYOMING WOLF COALITION, | ) |
| | ) |
| Petitioner-Intervenor, | ) |
| | ) |
| v. | ) Case No. 09-CV-118J |
| | ) |
| UNITED STATES DEPARTMENT OF THE | ) |
| INTERIOR; UNITED STATES FISH AND | ) |
| WILDLIFE SERVICE; KEN SALAZAR, in | ) |
| his official capacity as Secretary of the | ) |
| United States Department of the Interior; | ) |
| ROWAN GOULD, in his official capacity as | ) |
| Acting Director of the United States Fish | ) |
| and Wildlife Service; and STEPHEN | ) |
| GUERTIN, in his official capacity as the | ) |
| Regional Director for the Mountain- | ) |
| Prairie Region of the United States Fish | ) |
| and Wildlife Service, | ) |
| | ) |
| Respondents. | |

consolidated with

broker.aspx (JPEG Image 808 x 809 pixels) Case 2:09-cv-00138-ABJ   Document 29   Filed 11/18/10   Page 102 of 104   http://ecf.21vestlaw.com/broker/broker.aspx?mtext=FR-FIND&sn=2A...



Figure 1: Northern Rocky Mountain Gray Wolf Distinct Population Segment Area Including Individual Wolf Pack Territories.



# Recommended Area Where Wolves
# Remain Listed in Wyoming

WGFD Trophy Game Area

Wolves remain listed in WY

Suitable habitat (Oakleaf et al. 2006)

AR2009-029051




# Gray Wolf Range in the Contiguous United States

**U.S. Fish and Wildlife Service**

Gray wolves once lived in much of the contiguous United States. They were only absent from a portion of California, the southwest corner of Arizona and from the red wolf range in the southeastern United States. By 1974, when gray wolves were listed as an endangered species, their breeding range had been reduced to a small corner of northeastern Minnesota and Isle Royale, Michigan. Individual wolves were periodically observed in the West, but there were no breeding packs. Recovery efforts have since restored the wolf to many areas of its historic range, including portions of the Southwest, the Rocky Mountains, and the western Great Lakes Region.



Gray Wolf Range at Time of ESA Listing



Historic Gray Wolf Range



Current Range and Mexican Wolf Recovery Area

http://www.fws.gov/mountain-prairie/species/mammals/wolf/
NationalRangeMap.pdf
(site visited October 21, 2010)

March 2006